KNOX COUNTY RURAL ELECTRIC MEMBERSHIP CORPORATION, Appellant/Cross–Appellee Petitioner,

v.

PSI ENERGY, INC., Black Beauty Coal Company and the Office of the Utility Consumer Counselor of the State of Indiana, Appellees/Cross Appellees.

No. 93A02–9406–EX–370.

Court of Appeals of Indiana.

March 21, 1996.

David S. Richey, Carol Sparks Drake, Parr Richey Obremskey & Morton, Lebanon, for Knox County Rural Electric Membership Corporation.

John F. Wickes, Jr., Todd A. Richardson, Lewis & Kappes, Indianapolis, for Black Beauty Coal Company.

Kay E. Pashos, PSI Energy, Inc., Plainfield, Duejean C. Garrett, Baker & Daniels, Indianapolis, for PSI Energy.

## OPINION

SHARPNACK, Chief Judge.

Knox County Rural Electric Membership Corporation ("Knox") appeals the order of the Indiana Utility Regulatory Commission ("Commission") stratifying Knox's service territory and granting appellee/cross-appellant, PSI Energy, Inc. ("PSI"), the right to service appellee/cross-appellant, Black Beauty Coal Company's ("Black Beauty") coal mining operation. We affirm.

Knox raises three issues for our review:

1. whether the Commission exceeded its authority when it stratified Knox's service territory;

2. whether the Commission acted contrary to law when it linked the boundary of PSI's service territory with the permits filed with the Department of Natural Resources; and

3. whether the Commission acted contrary to law by failing to compensate Knox for its loss in servicing the assigned area.

On cross-appeal, PSI and Black Beauty raise two issues:

1. whether the Commission erred by holding that a customer who legally purchases electricity may not construct its own private distribution facility to transport the electricity across the boundary of two suppliers' service areas without violating Ind.Code § 8–1–2.3–4(b); and

2. whether the Commission erred by not finding an underground mining tract to constitute either a split-site or a single industrial operation.

*BACKGROUND*

Before addressing the merits of this litigation, it would be helpful to give context to the issues by briefly explaining the history of retail electric service territories and by setting forth the applicable statute in detail. In 1980, the General Assembly enacted Ind. Code § 8–1–2.3 creating a procedure in which the Commission was directed to draw the boundaries for electrical service areas. This legislation emerged from a long history of disputes between the rural cooperatives and privately or municipally owned utilities. Prior to 1980, the rural cooperatives were subject to eminent domain by private and municipal utilities under certain circumstances which created bitter disputes and were a source of much litigation. The purpose of the 1980 act was to draw permanent boundaries in an effort to eliminate these disputes and litigation. *See United Rural Electric v. Indiana & Michigan Electric* (1990), Ind., 549 N.E.2d 1019, 1021. Accordingly, the relevant portions of the statute provide:

"8–1–2.3–1. **Legislative findings— Declaration of policy.**—It is declared to be in the public interest, that, in order to encourage the orderly development of coordinated statewide electric service at retail, to eliminate or avoid unnecessary duplication of electric utility facilities, to prevent the waste of material and resources, and to promote economical, efficient, and adequate electric service to the public, the currently unincorporated areas of Indiana shall be divided into designated geographic areas within which an assigned electricity supplier has the sole right to furnish retail electric service to customers.

\* \* \* \* \* \*

8–1–2.3–3. **Assigned service areas.**—

\* \* \* \* \* \*

Once established according to this section, the boundaries of assigned service areas may not be changed except as provided in section 6 [IC 8–1–2.3–6] of this chapter.

8–1–2.3–4. **Service area rights.**—(a) As long as an electricity supplier continues to provide adequate retail service, it shall have the sole right to furnish retail electric service to each present and future consumer within the boundaries of its assigned service area and no other electricity supplier shall render or extend retail electric service within its assigned service area unless the electricity supplier with the sole right consents thereto in writing and the commission approves. . . .

(b) If an electricity supplier unlawfully renders or extends retail electric service within the assigned service area of another electricity supplier, the electricity supplier which has the sole right to furnish retail electricity service in that assigned service area may bring an action . . . to enjoin the other electricity supplier from rendering or extending such unlawful retail electric service.

\* \* \* \* \* \*

8–1–2.3–6. **Change of service area boundaries.**—The boundaries of the assigned service areas of electricity suppliers may not be changed except under any one (1) of the following circumstances:

\* \* \* \* \* \*

(3) In the case where a landowner owns a single tract of land which is intersected by the boundary lines of two (2) or more

assigned service areas, and retail electric service can best be supplied by only one (1) electricity supplier [a split-site], or in the case where a customer or customers which are housed in a single structure or which constitute a single governmental, industrial or institutional operation, and the electricity suppliers involved are unable to agree which shall furnish the electric service [a single operation], any of the electricity suppliers may submit the matter to the commission for its determination based upon public convenience and necessity. If, after notice and hearing, the commission determines that one (1) or more electricity suppliers are to supply the required retail electric service and the boundaries of an assigned service area are to be changed, the assigned service area maps of the electricity suppliers shall be changed to reflect the new boundaries."

I.C. 8–1–2.3–1 *et seq.* The legislation also authorized the Commission to administer the regulatory scheme. It is the Commission's interpretation and application of I.C. § 8–1–2.3 that is at the heart of this case.

### FACTS

Black Beauty is a coal mining company that acquired the underground mineral rights to a deposit of underground coal known as the Monroe City Reserve in Knox County, Indiana. The total area to be mined underlies the service areas of PSI and Knox, two corporations engaged in the business of providing retail electric service. Both Knox and PSI qualify as electrical suppliers under the territorial protection legislation enacted by the Indiana General Assembly in 1980. In August of 1983, the Commission approved boundary lines defining the respective territories of each.

The coal is to be mined by perhaps as many as three underground mines, identified as AQ1, AQ2, and AQ3. At present, Black Beauty has fully developed and has begun to mine AQ1. The second mine, AQ2, is in the process of being developed, and AQ3, is completely undeveloped.[1] The operation of AQ1 began in 1993 and is expected to continue for fourteen to twenty years. The mining operation was expected to extend to the AQ2 tract by 1995.

Most of the total acreage of the Monroe City Reserve is within Knox's service territory.[2] However, Black Beauty owns a 232 acre tract of land in fee simple that is entirely within PSI's service territory and is the area in which the "portal" and all of the above-ground mining facilities for AQ1 are located.[3] Thus, while most of the territory is within Knox's area, the Commission determined that 40% of the total expected electric load of AQ1 is within PSI's service territory and the remaining 60% would fluctuate between the service territories due to the migratory nature of this mine.[4] The portal for AQ2 is located within Knox's service territory.

Black Beauty intended to receive electricity for AQ1 and AQ2 at an electrical substa-

---

1. Because development of AQ3 is highly speculative, the Commission determined that it would be inappropriate to address electrical service as it applied to that tract.

2. The acreage of AQ1 is disputed by the parties. Based upon permit applications filed with the Indiana Department of Natural Resources, Knox contends the AQ1 mine covers 2,800 acres, 73% of which is in its service territory. However, PSI and Black Beauty maintain that AQ1 covers 7,196 acres, 94% of which is in Knox's service territory.

3. The "portal" is the primary ground opening to the underground mining operation. The process of underground mining involves delivering coal to the portal. The coal comes from below ground via the portal and is transported into various stockpiles. The coal then goes through a blending operation and is conveyed to a preparation plant, where the coal is separated from the rock by a washing, crushing, screening, and drying process. The coal is then placed in a clean coal pile where it is loaded onto trucks for transportation to a railroad site.

4. Underground coal mining consists of removing the coal from deep within the ground by following the coal seams. Thus, by its very nature, underground coal mining is migratory (i.e., moving from coal seam to coal seam). For this reason, development of the mine is an evolutionary process and the configuration of the mine may change dramatically from year to year. Therefore, the ultimate configuration of the mine is unknown, although the evidence at the hearing established that the migration of the mine will not extend any further east into PSI's service territory.

tion located at the AQ1 portal. From there, Black Beauty planned to distribute the electricity to AQ2 through a line privately owned and operated by Black Beauty.

Black Beauty preferred that PSI act as the sole supplier of electricity because of concerns about worker health and safety, reliability and stability of service, and the existing business relationship. Furthermore, a prior service arrangement by Knox at an unrelated facility left Black Beauty dissatisfied with Knox's service.

After learning that Black Beauty intended to pursue a coal mining operation across the Monroe City Reserve, Knox commenced this action and petitioned the Commission to modify the service area boundaries between Knox's and PSI's service territories pursuant to Ind.Code § 8–1–2.3–6(3) [hereinafter "section 6(3)"]. Knox requested that the Commission determine whether the mining operation would constitute a single industrial operation and, if so, modify the existing boundary lines to allow Knox to service Black Beauty's operations exclusively.

In its answer, PSI requested that it be the sole supplier of electricity to Black Beauty or, in the alternative, that Black Beauty be allowed to extend a private distribution line from the AQ1 portal and into Knox's service territory. PSI did not request the Commission to modify the boundary lines. Black Beauty petitioned to intervene.

On June 14, 1993, a public evidentiary hearing was conducted by the Commission. At the hearing, Knox requested a modification of existing boundary lines. Black Beauty neither objected to nor sought a boundary modification, but requested service to be provided exclusively by PSI. PSI requested that it be permitted to serve Black Beauty without modifying the boundaries.

On June 1, 1994, the Commission entered its order to "stratify" the service territory such that PSI would service the AQ1 mine in the subsurface areas underlying Knox's assigned service area, while Knox would retain the right to serve the surface areas over the mine and within its assigned territory. First, the Commission determined that it had jurisdiction over the case because the matter was governed by section 6(3). Section 6(3) authorizes jurisdiction if the disputed area constitutes either a split-site or a single industrial operation. I.C. § 8–1–2.3–6(3). If the preliminary elements are met, the Commission may make its determination of which entity shall be the supplier by applying a test of public convenience and necessity. Upon concluding that the AQ1 mine was a single industrial operation and that section 6(3) applied, the Commission determined that public convenience and necessity favored PSI in servicing the AQ1 mine. The Commission found:

"Of the six factors discussed above, one was irrelevant (historical considerations), and another favored neither utility (duplication of facilities). Thus our determination of public convenience and necessity will be based on the four remaining factors. Recapping our findings on those four factors, we found that both PSI and Knox were able to provide adequate and reliable service. With regard to the ability of the two utilities to provide enhanced service, PSI had an advantage, but in the absence of any evidence supporting a material benefit accompanying that advantage, we found that this enhanced service factor should be given little weight. With respect to the financial impact of the AQ1 mine on the two utilities, we found that PSI, though larger, was not significantly better able to absorb the future inevitable closing of the AQ1 mine. With regard to plurality, we determined that plurality of use was a more appropriate test than plurality of area. From the evidence presented, we found that plurality of use did not convincingly favor either PSI or Knox. Finally, we found that customer preference favored PSI.

In addition to the above factors, we recall the physical circumstances to the AQ1 mine. Through geological and business necessity, the portal to the AQ1 mine is the only viable point to receive and distribute electricity to the mine. The portal for the mine is located in PSI's service area, as are all of the above ground operations that support the underground mining. Bearing in mind the unusual physical circumstances of the AQ1 mine, and after

considering all of the evidence and the arguments of the parties, we find that public convenience and necessity favor allowing PSI to serve the AQ1 mine."

Record, p. 342. However, after determining that public convenience and necessity favored allowing PSI to service the AQ1 mine, the Commission explained why it did not want to modify the boundaries using the traditional approach:

9. *Change in Service Area Boundary.* In Finding No. 8, we determined that Black Beauty cannot extend electric service from PSI's service area into the Disputed Area without causing a violation of I.C. 8–1–2.3–4. The only way to avoid such a violation is to change the service area boundary so that all of the Disputed Area falls within PSI's service area. Section 6(3) permits us to change boundaries based on public convenience and necessity. However, the unusual facts of this case make it difficult to decide just how to redraw the service area boundary between Knox and PSI.

One obvious way to redraw the boundary between PSI and Knox would be to give PSI the right to serve those surface areas within Knox's service area that overlie the Disputed Area. At least two problems arise by following this 'traditional' approach. First, the geographical and geological limits of the mine, though generally known, are not known with any specificity, and will not be known until after the mine is dug. Coordinating underground mining with the reassignment of surface service areas would be fraught with problems and would be administratively burdensome. Second, and more importantly, we may lack jurisdiction to redraw the surface service area boundaries. Unless those surface areas overlying the Disputed Area involve split-site or integrated operations, I.C. 8–1–2.3 will not allow us to

change the electricity suppliers for those surface areas. Section 6(3) allows us to change electricity suppliers based on public convenience and necessity, *but only* if the affected areas qualify as split-site or integrated operations. We have heard no testimony about the nature of the affected surface area, except that it is agricultural and that Knox does have existing customers.[5] Even if the surface area did qualify as a split site or integrated operation, it is possible, due to concerns about duplication and efficiency, that public convenience and necessity would dictate that different electricity suppliers serve the surface and the Disputed Area, thus preventing the assignment of both surface and subsurface customers to the same electricity supplier.

A second approach to changing the service area boundary line can be characterized as a three-dimensional solution to a two-dimensional problem. In essence, this approach *would augment PSI's service area to include a horizontal 'slice,' underneath the surface of Knox's service area, that would include all of the Disputed Area.* Knox argues that such treatment is a type of 'overlap' which this Commission has rejected in the past. We disagree. This 'slice' approach in fact involves a change in service area, although on a different plane than what is normally done. We will explain: Usually service areas are thought of as being two-dimensional. However, a service area includes not only the bounded surface area, but also areas above and below the surface. Thus a service area is three-dimensional, although we normally ignore the vertical dimension. Stated another way, a service area can be thought of as layer upon layer of superimposed planes, beginning at the surface and extending vertically both upwards and downwards. Ordinarily, when a service area boundary is changed, all planes, above

5. We note the complexity of the Commission's analysis and offer the following as guidance. Section 6(3) authorizes the Commission to modify boundaries once a territory has been established to be either a split-site or a single industrial operation. However, while the Commission determined that the AQ1 subsurface area mine qualified as a single industrial operation, the Commission lacked the evidence to determine whether the surface area qualified. Thus, the Commission questioned whether it had the jurisdiction to change the surface boundaries under the traditional approach. Faced with this dilemma, the Commission ordered the territory to be stratified. The stratification enabled the Commission to allow PSI to service the subsurface areas but left the questionable surface area intact.

and below the surface, are implicitly changed as well. The slice approach described above offers a means of changing a subsurface boundary while leaving the surface boundary unchanged.

Record, p. 344–345 (emphasis added).

## DISCUSSION

At the outset, we note our jurisdiction over this matter. Ind.Code § 8–1–3–1 provides that any corporation or utility adversely affected by a Commission's ruling may appeal to our court within thirty days from the order. I.C. § 8–1–3–1. In reviewing the Commission's order, we employ a two-tier standard of review. First, we determine whether the decision is supported by specific findings of fact and by sufficient evidence. Second, we consider whether the decision is contrary to law. *Columbia City v. Indiana Util. Regulatory Comm'n,* 618 N.E.2d 21, 23 (Ind.Ct.App.1993), *reh'g denied.* A decision is contrary to law when the Commission fails to stay within its jurisdiction and to abide by the statutory and legal principles which guide it. *Gary–Hobart Water Corp. v. Indiana Util. Regulatory Comm'n,* 591 N.E.2d 649, 652 (Ind.Ct.App. 1992), *reh'g denied.*

### I.

The first issue raised for our review is whether the Commission exceeded its statutory authority and its jurisdiction by stratifying the service territory. We find it did not. In making this determination, we look to settled law, statutory interpretation, and the expertise of the Commission.

It is a fundamental principle of law that the Commission, an administrative body of the state, derives its authority solely from the legislature and thereby possesses only those powers conferred on it by statute. *Kentucky–Indiana Mun. Power Ass'n v. Public Serv. Co.,* 181 Ind.App. 639, 393 N.E.2d 776, 780 (1979). Thus, unless a grant of power can be found in the statute, we must conclude that there is none. *Citizens Action Coalition v. NIPSCO,* 485 N.E.2d 610, 612 (Ind.1985), *cert. denied,* 476 U.S. 1137, 106 S.Ct. 2239, 90 L.Ed.2d 687. Accordingly, any doubt about the existence of

authority must be resolved against a finding of authority. *South Eastern Indiana Natural Gas Co. v. Ingram,* 617 N.E.2d 943, 947 (Ind.Ct.App.1993).

However, we have also held that in addition to the generally accepted principle that an administrative agency may not exercise power which is not granted to it by statute, "it is equally well settled that an administrative agency has such implicit power and authority as is inherent in its broad grant of power from the legislature to regulate [that] which is necessary to effectuate the regulatory scheme outlined by the statute." *NIPSCO v. Citizens Action Coalition,* 548 N.E.2d 153, 158 (Ind.1989); *see also Indiana Util. Regulatory Comm'n v. Gary Joint Venture,* 609 N.E.2d 7, 10 (Ind.Ct.App. 1993) *reh'g denied, trans. denied,* (holding that state agencies "possess powers beyond those expressly set forth in the authorizing statutes.") *disapproved of on other grounds by Austin Lakes Joint Venture v. Avon Utils., Inc.,* 648 N.E.2d 641 (Ind.1995).

On appeal, Knox argues that the Commission lacked the authority to stratify the territory because section 6(3) does not specifically provide for stratification. While Knox is correct in noting the absence of the word "stratify" from the statute, what the statute does provide is the implicit power and authority to stratify, which is inherent in the Commission's broad grant of power from the legislature. *See NIPSCO,* 548 N.E.2d at 158.

In construing an Indiana statute, our duty is to ascertain and give effect to the legislative intent. *Dague v. Piper Aircraft Corp.,* 275 Ind. 520, 418 N.E.2d 207, 210 (1981). In determining the legislative intent, the language of the statute itself must be examined, including the grammatical structure of the clause or sentence in issue. *Foremost Life Ins. Co. v. Department of Ins.,* 274 Ind. 181, 409 N.E.2d 1092, 1096 (1980). Moreover, a statute is to be examined and interpreted as a whole. *Kinder v. Doe,* 540 N.E.2d 111, 114 (Ind.Ct.App.1989).

The statute at issue today contemplates three situations in which strict adherence to the territorial boundaries reflected in the

maps could be contrary to the public interest: (1) The boundary between territories cuts across a tract of land owned by a single entity and service to the tract can best be supplied by only one supplier; (2) A customer or customers are housed in a single structure (which is astride a boundary) and the suppliers involved are unable to agree which shall furnish the electricity; and (3) a customer or customers constitute a single governmental, industrial, or institutional operation (which operates across a boundary) and the suppliers involved are unable to agree which shall furnish the electricity. I.C. § 8–1–2.3–6(3).

In any of these three situations, any one of the electrical suppliers may submit the matter to the Commission for a determination based upon public convenience and necessity. If the Commission determines that one or more retail suppliers are to supply the electric service and the boundaries are to be changed, then the assigned service area maps shall be changed to reflect the new boundaries. *Id.* Because the final sentence in section 6(3) is written as it is, we conclude that a change of the boundaries is not required in all cases covered by section 6(3), and that it is within the Commission's discretion to determine whether to change the boundaries and reflect the change upon the assigned service area maps. If the legislative intent was such that a boundary change was required in all instances, the final sentence of section 6(3) would read: "[i]f, after notice and hearing, the Commission determines that one or more electricity suppliers are to supply the required retail electric service, the boundaries of the assigned service areas shall be changed and the assigned service area maps shall be changed to reflect the new boundaries." Our understanding that the Commission has discretion to change the boundaries is enhanced by consideration of the differences between the three situations described in section 6(3).

The first, where a tract owned by a single entity is divided among two or more service territories and can best be served by only *one* provider is certain to result in a change of boundary such that the entire tract (which could be many acres) would be located within *one* supplier's territory. Inherent in the characteristic that the tract can best be served by only one provider is the certainty that the Commission's determination would change the boundaries to incorporate all of the tract within one service territory.

As a comparison, the second situation, where only a single structure is involved, could be resolved by reference to the service to the structure alone and would not require a change of the boundaries. The two or more territories in which the single structure sits would otherwise be unaffected. The third situation, with which we deal here, is also a situation where the Commission could determine which entity would service the single operation and otherwise leave undisturbed the service territory boundaries. These latter situations provide for factual circumstances in which the Commission could specifically delineate which entity is to service the structure or operation without changing the boundaries or the maps. The mere fact that such situations are described in the statute supports our statutory interpretation that the Commission is not required in all cases to change the boundaries.

In the present case, the Commission found that the AQ1 mine was a single industrial operation. As a result of this finding, either retail supplier could petition the Commission for a determination, based on public convenience and necessity, of which supplier is better able to service the operation. Applying the statutory interpretation to these facts, it is clear that the Commission determined that PSI was better able to service the AQ1 mine. The Commission clearly delineated PSI's role and limitations in servicing the mine. Thus, based on our statutory interpretation, we find that the Commission acted within its discretion in allowing PSI to service the AQ1 mine operation to the extent of its development beneath the surface of Knox territory. It could have done so without the reference to stratification. The employment of the stratification and associated boundary change device is not beyond the authority of the Commission.

Moreover, we recognize the deference given to the Commission's expertise. "The Public Service Commission [now the

IURC] was established 'to insure that public utilities provide constant, reliable and efficient service to its customers, the citizens of this state.'" *PSI, Inc. v. Nichols*, 494 N.E.2d 349, 353 (Ind.Ct.App.1986), *reh'g denied* (quoting *Office of Util. Consumer Counselor v. PSI, Inc.*, 463 N.E.2d 499, 503 (Ind.Ct.App.1984)). The express policy of the statutory scheme is to prevent the waste of material and resources and to promote economical, efficient and adequate electric service. I.C. § 8–1–2.3–1. Thus, the Commission is "imbued with broad discretion necessary for it to perform its function and arrive at its goals." *OUCC*, 463 N.E.2d at 503. Moreover, "[a]s an administrative agency, [the Commission] is presumed to be qualified by knowledge and experience.... The regulation of public utilities is a technical field requiring expertise...." *Decatur County Rural Elec. Membership Corp. v. Public Serv. Co.*, 150 Ind.App. 193, 275 N.E.2d 857, 862 (1971). It seems logical then, that the Commission should be able to end its inquiry at the point of determining which supplier should service the customer. If the goal of the statute viewed as a whole is to promote economical, efficient, and adequate service, then the Commission must have the power, whether implied or express to carry out that goal.[6]

Therefore, upon our review of the statute and in light of the deference afforded the Commission and its expertise, we hold that the Commission was authorized to stratify the service territory.

## II.

The second issue raised for our review is whether the Commission acted contrary to law and exceeded its authority when it linked PSI's service boundaries with Department of Natural Resource ("DNR") permits. The Commission ordered PSI's service area to be expanded to include those areas which could be mined through the AQ1 portal and for which Black Beauty held a DNR permit. Since there were no permits on record at the time of the order, PSI was given fifteen days to file a copy of the permits held by Black Beauty for the AQ1 mine. The Commission also provided that all parties would have an opportunity to voice their concerns at a later hearing. "Also at the hearing, the parties will be afforded an opportunity to suggest an appropriate method to reflect future changes in the DNR permits." Record, p. 346.

Knox argues that the Commission erred in allowing PSI to service those areas for which Black Beauty had obtained a permit. Specifically, Knox objected to the Commission's order because Knox claimed the order would allow PSI to service areas beyond the boundaries established at the hearing by the DNR maps. Moreover, if the Commission authorized PSI to service the AQ1 mine, then the boundaries established by the DNR permits should have become PSI's new territorial boundaries. "Any mining beyond those boundaries was not within the single industrial operation as of the hearing, but rather, was in AQ2 or AQ3 which the Commission declared were not split sites." Appellant's brief, p. 22. Thus, Knox claimed the Commission erred when it approved a procedure "which enables Black Beauty, based upon how it modifies its permit applications in the future, to obtain service from PSI within an area the Commission found was not a split-site." Appellant's brief, p. 23. Knox characterizes the order as a "blank check" for PSI to service the AQ1 mine as it migrates. Finally, Knox claimed it might lose the right to service the territory without a hearing and in violation of its due process rights.

**6.** Finally, we address Knox' argument that it had the sole right to render retail electric service on its assigned territory pursuant to I.C. § 8–1–2.3–4. Again, when construing a statute, we must view it as a whole. *Kinder*, 540 N.E.2d at 114. Therefore, we will not read section (4) as if it were standing alone. Rather, we have explained that section 6(3) authorizes the Commission to make a determination of service based upon public convenience and necessity. Thus, once a split-site or single industrial operation is present and a supplier petitions for review, section 6(3) governs the service irrespective of the mandate in section (4). Were we to decide otherwise, section 6(3) would be a nullity. In construing a statute, the court will presume that the legislature did not enact a useless provision. *Hinshaw v. Board of Comm'rs of Jay County*, 611 N.E.2d 637, 638 (Ind.1993). Therefore, to interpret this statute logically, section (4) applies unless one of the limited factual possibilities described in section (6) is satisfied.

As we have previously discussed, the Commission determined that the AQ1 mine was a single industrial operation and possibly also a split-site. In accordance with part I of this opinion, the Commission was authorized to change the boundaries at its discretion. The Commission sought to limit the amount of territory that PSI would service and decided to link the boundaries with the permits. We find this to be a reasonable solution within the scope of the Commission's authority. Particularly, under the single operation analysis, it is service to the operation that the Commission is providing for rather than service to the territory.

■ Moreover, Knox's suggestion that its due process rights have been or will be violated is unfounded. The Commission ordered a timely hearing for all parties to "express their concerns." The order also stated that all parties would be given an opportunity to suggest a procedure to be used for future changes. Accordingly, the method to be used for future changes in the permits has not been decided. Rather, Knox will be given an opportunity to suggest an appropriate procedure. Therefore, Knox's due process rights have not been violated and the Commission's order is not contrary to law. *See Columbia City*, 618 N.E.2d at 23.

### III.

■ The final issue raised on appeal by Knox is whether the Commission acted contrary to law by failing to compensate Knox for its loss in servicing the AQ1 area within its assigned service territory. In its brief, Knox argues that the right to supply electrical service constitutes property and, therefore, may not be taken without just compensation.[7]

---

7. Knox relies on the case of *Indiana & Michigan Elec. Co. v. Jay County REMC*, 510 N.E.2d 225 (Ind.Ct.App.1987), *reh'g denied, trans. denied,* in support of its argument that the statutory scheme recognizes the "intrinsic money value of the service areas [it] created." *Id.* at 227. However, we find Knox's reliance on the case to be misplaced. In *Indiana & Michigan,* we construed the meaning of "severance damages" as the words are used in I.C. § 8–1–2.3–3(b)(1). That section allows one retail electrical supplier to

PSI advances two arguments in support of its conclusion that Knox is not entitled to compensation. The first argument is a matter of statutory interpretation. Since the legislature provided for compensation in a number of instances throughout I.C. § 8–1–2.3, but did not so provide in section 6(3), PSI argues that the legislature intended for there to be no compensation. Furthermore, PSI argues that the absence of a compensation provision in section 6(3) is consistent with its operation. Specifically, PSI contends that the statute is organized in such a manner that an electricity supplier is given the right to service a specific territory but that the right is "subject to divestment" if the Commission changes the boundaries pursuant to section 6(3). Appellee–PSI's brief, p. 32. We agree. A fundamental rule of statutory construction is to give effect to the legislative intent. *Walling v. Appel Serv. Co.,* 641 N.E.2d 647, 651 (Ind.Ct.App.1994). Upon our reading of 6(3), we find that the legislature did not intend to provide compensation for the modification of boundaries and for the change of service because there is no reference to compensation or damages.

■ Moreover, the absence of a compensation provision in section 6(3) is consistent with its operation. In interpreting statutes, we will attempt to apply the statute practically, to construe it so as to prevent absurdity, hardship, injustice, and to favor public convenience. *Miller v. State,* 641 N.E.2d 64, 68 (Ind.Ct.App.1994), *trans. denied.* Under the statute, a supplier is given the right to service a specific territory. However, the Commission is authorized to change the boundaries if certain qualifications are met. It would not be practical and would create a hardship on the Commission and the public if the loss of service of one retailer needed to be compensated. Again, an express purpose

purchase the property of another supplier located within the same municipality if both suppliers are rendering retail service within those same limits. I.C. § 8–1–2.3–3(b)(1).

*Indiana & Michigan* is distinguishable because there, we interpreted § 3(3)(b)(1), a wholly independent provision which explicitly provided for damages. There is no provision for compensation or damages in section 6(3) and, therefore, we find *Indiana & Michigan* to be inapplicable.

of the legislation is "to promote economical, efficient, and adequate electric service to the public." I.C. § 8–1–2.3–1. We find that a compensatory program would defeat the intended purpose of the statute and would create an undue hardship. Therefore, we will not interpret the statute in a manner to require Knox to be compensated for its loss of the authority to serve the AQ1 mine.

Finally, we are persuaded by PSI's argument that Indiana courts have denied compensation in analogous situations. In *SIGECO v. Department of Highways*, 533 N.E.2d 1289 (Ind.Ct.App.1989), *trans. denied*, we held that a public utility company's right to locate its facilities in city streets was subject to the police power of the state in the interest of health, safety and convenience. Therefore, we held that requiring the company to move its in-street facilities because of major road construction without compensation did not constitute an unlawful taking. *Id.* at 1292.

> "[W]hatever rights SIGECO acquired by reason of the franchise agreement [to provide electricity and gas] were subject to any proper regulations as might be required in the interest of the public health and safety.... [T]herefore, SIGECO's compliance with an order imposed in the interest of the public safety at its own expense did not amount to taking its property without due compensation."

*Id.* We find a similar scheme in the present case. Here, Knox had been given a statutory right to service an assigned service territory. However, that right was subject to the Commission's determination in the interest of public convenience and necessity. Therefore, we hold that Knox's compliance with that order did not amount to a taking. Consequently, the Commission's order denying compensation to Knox is not contrary to law.

## IV.

The first issue raised on cross-appeal is whether the Commission erred in finding that Black Beauty could not construct its own private distribution facility to transport the electricity across the boundary of the two service areas without violating I.C. § 8–1–2.3–4(b). PSI and Black Beauty argue that the Commission did not exceed its authority to the extent it determined that PSI should be the sole supplier of electricity to the AQ1 mine, but did act contrary to law when it, in effect, regulated a private nonutility company.

Having found that public necessity and convenience favored allowing PSI to service the AQ1 mine, the Commission faced an unusual problem since neither PSI nor Black Beauty had requested a boundary modification. Neither company requested a change because Black Beauty intended to receive the electricity from PSI through the AQ1 portal in PSI's service territory and then privately distribute it throughout the AQ1 mine. Since part of the AQ1 mine is within Knox's service area, Black Beauty's private distribution would inevitably transmit electricity across territory lines and into Knox's service area. Knox argued that such action would violate I.C. § 8–1–2.3–4. This section provides:

> "**Service area rights.**—(a) As long as an electricity supplier continues to provide adequate retail service, it shall have the sole right to furnish retail electric service to each present and future consumer within the boundaries of its assigned service area and no other electricity supplier shall render or extend retail electric service within its assigned service area....
>
> (b) If an electricity supplier unlawfully renders or extends retail electric service within the assigned service area of another electricity supplier, the electricity supplier which has the sole right to furnish electric service in that assigned service area may bring an action ... to enjoin the other electricity supplier from rendering or extending such unlawful retail electric service."

I.C. § 8–1–2.3–4(a)–(b).[8] While conceding that Black Beauty is not an electricity supplier and is not subject to this section, the Commission nevertheless ordered that PSI

---

8. "Retail electric service" is defined as "electric service furnished to a customer for ultimate consumption,...." I.C. § 8–1–2.3–2(c).

could be prohibited from rendering the electricity to Black Beauty, which would then privately distribute it. "Thus, while I.C. 8-1-2.3 may not prohibit the planned extension of electric facilities by Black Beauty, it certainly can be used to prevent PSI from rendering any and all electric service to the mine." Record, p. 343.

PSI argued that the extension of customer owned transmission lines by Black Beauty into Knox's service territory is not prohibited by section (4) because Black Beauty is not an electricity supplier and, therefore, not subject to the statute's limitations. Moreover, PSI claimed that the Commission's order effectively holds it responsible for its customer's use because PSI would be charged with "rendering" the service based upon Black Beauty's use.

Black Beauty argued it had the right to privately distribute electricity and cited *U.S. Steel Corp. v. NIPSCO*, 482 N.E.2d 501 (Ind. Ct.App.1985), *reh'g denied*, 486 N.E.2d 1082, *trans. denied*, in support.

In *U.S. Steel*, we addressed whether a steel producer constituted a "public utility" under I.C. § 8-1-2-1. U.S. Steel was a Delaware corporation which owned two production facilities: Gary Works in Gary, Indiana and South Works in Chicago. NIPSCO supplied electricity to Gary Works and Commonwealth Edison Co. supplied electricity to South Works. After a substantial outlay of money and time, U.S. Steel was prepared to install a transformer which would take the power it purchased from Commonwealth and mix it with NIPSCO's power to supply Gary Works, and take power purchased from NIPSCO and mix it with Commonwealth's power to supply South Works. The mixed power would only be used by U.S. Steel and would not be distributed to other users. U.S. Steel brought a declaratory action to determine whether this transmission would be subject to regulation by the Commission. We held that the Commission did not acquire jurisdiction over U.S. Steel or Commonwealth because neither qualified as a "public utility" as defined by the Act. In the analysis, we stated,

"Commonwealth and U.S. Steel apparently intend title to Commonwealth's electric power to pass to U.S. Steel upon its delivery to South Works. At that point, the electricity becomes U.S. Steel's property. Because Commonwealth owns no facilities in Indiana, and will have no title to the electricity proposed to be transmitted by U.S. Steel to Gary Works, Commonwealth will not become a public utility subject to regulation in Indiana. Neither will U.S. Steel, by statutory definition and case law."

*U.S. Steel*, 482 N.E.2d at 504. In the opinion, this court discussed the minimum requirement for a business to acquire public utility status, "[i]t is an essential requirement that a business or enterprise must in some way be impressed with a public interest before it may become a public utility." *Id.* at 506. We held that U.S. Steel's transmission did not "impress" U.S. Steel with a public interest, that the Commission did not have jurisdiction over U.S. Steel and, therefore, that the laws regulating public utilities would not apply. Furthermore, on rehearing we stated, "[a]ny attempt to impress public utility status upon private property not dedicated to public use constitutes a taking thereof for public uses without just compensation in violation of the Fourteenth Amendment." *U.S. Steel*, 486 N.E.2d at 1085.

Black Beauty relied upon the holding in *U.S. Steel* to support its argument that electricity becomes the private property of the customer once purchased. Black Beauty argued that the Commission acted contrary to law when it held that it could not privately distribute the electricity once purchased from PSI because Black Beauty was not an electricity supplier. Moreover, Black Beauty argued that imposing public utility regulation on the private use of electricity would be an unconstitutional taking.

Knox argued, and the Commission agreed, that *U.S. Steel* was inapplicable because the issue in that case was limited to whether the Commission had jurisdiction. In addition, the Commission stated that *U.S. Steel* was inapposite because there, unlike this case, neither U.S. Steel nor Commonwealth were suppliers within the meaning of the Act and, thus, I.C. § 8-1-2.3 could not be applied. The Commission determined that since *U.S.*

*Steel* did not apply, Black Beauty had no private ownership rights over the electricity.

However, the Commission erred in finding *U.S. Steel* inapplicable to this case. While it is true that the issue in *U.S. Steel* was whether the trial court had jurisdiction over the declaratory judgment action filed by U.S. Steel, resolution of that issue required a determination, among others, that Commonwealth would not be a public utility subject to regulation in Indiana because the electricity delivered by it to U.S. Steel at South Works in Illinois became the property of U.S. Steel at delivery. The subsequent transmission of that electricity on transmission lines owned by U.S. Steel into Indiana's Gary Works facility did not subject Commonwealth to regulation by the Commission.

In the case of *U.S. Steel,* the resolution of the issue of whether U.S. Steel's activity made it a public utility subject to the Commission's jurisdiction, turned on the facts that U.S. Steel was transmitting its own electricity by its own equipment, and that U.S. Steel was transmitting the electricity to itself and not to the "public".

Clearly under the authority of *U.S. Steel,* electricity once acquired by Black Beauty at the AQ1 portal would be Black Beauty's own property which it could then transmit within its own operation and without violating the territorial limitation of section (4). Likewise, Black Beauty's distribution of its own electricity would not constitute rendering or extension of retail electric service by PSI into Knox territory.

Furthermore, service within Black Beauty's AQ1 operation, having been awarded to PSI pursuant to section (6), would not be unlawful and would, thus, not violate the provisions of section (4). Therefore, once the Commission concluded that Black Beauty was not a public utility, it erred by attempting to regulate Black Beauty under the guise of regulating PSI pursuant to section (4).

Next, we find the Commission's rationale for its decision to be flawed. In support of its determination, the Commission stated that if Black Beauty's private distribution was not limited by section (4), then "a veritable Pandora's box of problems would ensue."

Record, p. 343. That is, without any restriction, the Commission believed that it would "behoove" every industrial operation to purchase land in an adjacent service area and obtain electrical service from whichever utility had the lowest rates that month. Record, p. 343. The Commission concluded that such action would devastate the suppliers' rate calculations and would contradict the statute's purposes to encourage orderly electric service.

The first flaw in the Commission's rationale is that chances are slim that single industrial operations would purchase adjacent land solely to take advantage of cheaper electrical rates, assuming the rates are cheaper. To take advantage of the cheaper rates, the operation would have to do more than simply purchase adjacent land. Instead, the operation would also have to build a working private distribution line and pay employees to operate the line. The Commission did not substantiate its conclusion with any economic analysis and we find it to be merely speculative.

Second, even if single industrial operations spent the money to purchase adjacent land, a distribution line, and the employees to operate the line, the Commission would still have the authority to correct the scheme to obtain cheaper rates. If one customer had land within two service territories, then a single industrial operation or split-site would exist, and, as a result, one of the two suppliers could petition the Commission for a determination based upon public convenience and necessity. The Commission's determination would take into account the customer's scheme.

Third and most importantly in this case, Black Beauty is not attempting to evade the statute. At the hearing it was established that the placement of the AQ1 portal was not done to gain the service of one particular utility, but rather was based on geological and land availability factors. "No party disputes the fact that the location of the AQ1 portal in PSI's service area was determined primarily by geological factors; the location of the portal was not the result of any contrivance by Black Beauty of PSI." Record, p.

327. Thus, the "Pandora's box" cited by the Commission is not an issue in this case.

We find no merit in the Commission's decision as it relates to Black Beauty's private transmission of electricity. Since the Commission based its decision to stratify on the erroneous assumption that Black Beauty could not privately distribute the electricity without violating the statute, the Commission was not required to stratify the disputed territory. However, as previously discussed, the ability to stratify, while not required, was well within the Commission's discretion and, therefore, the Commission did not err.

### V.

█ The final issue on cross-appeal is whether the Commission erred by not finding that the AQ2 mine constituted either a split-site or a single industrial operation. The Commission determined that section 6(3) did not apply to the AQ2 mine because the mine was neither a split-site nor a single industrial operation. The Commission based its decision on AQ2's shifting boundaries and the inability of the Commission to determine whether the mine would be intersected by a service area boundary line and whether two or more suppliers would be "involved" in the electricity supply because of the mine's location within two territories.

The Commission found that because the mine was migratory, it was impossible to determine with certainty whether the boundaries of the AQ2 mine would fall within PSI's service territory. The evidence supports the Commission's findings. At the hearing, the Commission was presented with a map depicting the AQ1 and AQ2 mines; the map was based upon the current permits filed with the DNR. The DNR records revealed there was no physical connection between the two mines. Rather, the map established that the AQ2 mine is solely within Knox's service area.[9] In addition, the AQ2 portal is within Knox's service territory. There is only a possibility that AQ1 and AQ2 will connect in the future. The Commission's determination that the AQ2 mine was not intersected by a service area boundary and that two or more suppliers were not "involved" in the electricity supply is supported by specific evidence and, therefore, is not contrary to law. *See Columbia City*, 618 N.E.2d at 23.

█ Finally, both PSI and Black Beauty argue that Black Beauty, as the coal miner, can provide the best prediction of the final boundaries of the AQ2 mine. Thus, both appellees argue that the testimony of Black Beauty's Vice President should be given the most weight. This argument is merely a request for us to reweigh the evidence. *Gary–Hobart Water*, 591 N.E.2d at 652. However, we may neither reweigh the evidence nor substitute our judgment for that of the Commission. *Id.* Rather, we will set aside the Commission's order only when a review of the whole record clearly indicates that the Commission's decision lacks a reasonably sound base of evidentiary support. *Id.* Upon our review, we hold that the Commission's decision does not lack a reasonably sound base of support and, therefore, the determination of the Commission is not contrary to law.

For the foregoing reasons, the Commission's order is affirmed in all respects.

AFFIRMED.

BARTEAU and RILEY, JJ., concur.

9. While the parties dispute the accuracy of various maps admitted into evidence, the Commission was free to weigh the evidence and adopt the boundaries depicted in the map based upon DNR permits.