UNITED RURAL ELECTRIC MEM-
BERSHIP CORPORATION, Ap-
pellant–Respondent,

v.

INDIANA MICHIGAN POWER COM-
PANY d/b/a American Electric Power
(AEP), Appellee–Petitioner.

No. 93A02–9809–EX–747.

Court of Appeals of Indiana.

Sept. 29, 1999.

David S. Richey, Robert J. Donahue, Parr Richey Obremskey & Morton, Indianapolis, Indiana, Carol Sparks Drake, Parr Richey Obremskey & Morton, Lebanon, Indiana, Attorneys for Appellant.

Marc E. Lewis, Indiana Michigan Power Company, Fort Wayne, Indiana, Daniel W. McGill, Nicholas K. Kile, Barnes & Thornburg, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

GARRARD, Judge

### Case Summary

United Rural Electric Membership Corporation ("United") appeals an order of the Indiana Utility Regulatory Commission ("Commission") in favor of Indiana Michigan Power Company d/b/a American Electric Power ("AEP"). We affirm.

### Issues

On appeal, United contends that AEP's petition to modify its service boundary with United should not have been granted because the Commission lacked authority under two subparts of Indiana Code Section 8–1–2.3–6(3). In contrast, AEP characterizes the issues as follows:

I. Whether substantial evidence supports the Commission's findings that an industrial park constitutes a single tract of land and a single operation over which the Commission possessed authority to modify electric service area assignment boundaries; and,

II. Whether United waived its argument that the Commission lacked jurisdiction over the case by filing the original petition seeking a change in the boundaries and by not raising its jurisdictional argument at the first available opportunity.

### Facts and Procedural History

United engages in the cooperative business of distributing retail electric service to its member-consumers within Indiana, including members in Allen County. AEP generates, transmits, and distributes wholesale and retail electric service to customers in Indiana and Michigan. The Fort Wayne–Allen County Airport Authority ("Authority") "is an independent municipal corporation, [yet is] deemed to be an arm of county government for budgetary purposes." Record at 432. The Authority "is charged with the ownership of all publicly owned and operated airports in Allen County and is responsible for their maintenance, development and promotion." *Id.* This includes the Fort Wayne International Airport ("Airport") and the 3,000 acres of land upon which it is situated.

Recently, after the acquisition of additional land and a positive feasibility study, the Authority decided "to undertake the development of the Air Trade Center" ("ATC"). *Id.* at 433. "The [ATC] consists of 443 acres of land owned by the Authority located at the southwest end of the [Airport] adjacent to the [Airport's] 12,000 foot runway." *Id.* at 434.

The purpose of the [ATC] is to promote and attract economic development activity to help support the economy of Northeast Indiana. The Authority seeks to transform the [ATC] into a developed industrial park that will attract industry to Fort Wayne and Allen County, provide additional employment, and afford incentives to induce employers to invest development capital in Northeast Indiana. The Authority is specifically targeting for location in the [ATC] commercial aeronautical activities, transportation related businesses, warehouse distribution facilities requiring air freight access and light manufacturing businesses requiring close proximity to air freight facilities. Because the [ATC] will be competing for tenants

with other regional airports, it is essential that the [ATC] be able to offer the best services available to prospective tenants.

*Id.* at 433–34. Infrastructure improvements had begun on the ATC project and several million dollars had been committed to it in 1997 and 1998. The Authority divided the ATC into twenty-seven lots. The first major tenant of ATC, American International Freight Division of American International Airways, Inc. ("AIF"), chose a seventy-five acre lot and "committed to a $33 million private development[.]" *Id.* at 435.

In 1986, the Commission approved a boundary through the Airport's land. United has provided electric service for the Airport on one side of the boundary and AEP has provided service on the other side. The present controversy arises because the original boundary currently bisects the ATC and AIF, and the Authority would prefer that there be only one service provider for the ATC.

On October 14, 1997, United filed a petition with the Commission seeking to modify existing electric service area boundaries so as to place the ATC entirely within United's assigned service area ("Cause No. 41017"). Three days later, AEP filed a petition with the Commission seeking to modify the same boundary so that ATC would be served exclusively by AEP ("Cause No. 41021"). Initially, the Commission consolidated the two causes.

On February 13, 1998, United filed a motion to dismiss Cause No. 41017 and filed an answer to Cause No. 41021. The Commission granted United's motion to dismiss and to file an answer. The Commission held a two-day evidentiary hearing on the matter in early April of 1998. In May of 1998, United filed a motion, and a brief in support thereof, requesting that AEP's petition be dismissed because the Commission did not have jurisdiction over the case under Indiana Code Section 8–1–2.3–6(3). On August 26, 1998, the Com-

mission issued a twenty-six page order, which stated in pertinent part:

1. AEP's petition shall be and hereby is granted.

2. The service area boundary as set forth in U.S.G.S. Facet W–8–1 shall be and hereby is modified so as to place the entirety of the [ATC] as shown on AEP Exhibit DLL–4 (Revised) in AEP's assigned service area.

3. To effectuate the change approved herein, AEP shall be and hereby is ordered to file with the Engineering Department a revised Mylar map of U.S.G.S. Facet W–8–1 showing the service area boundary change approved.

4. United's request for severance damages and/or a swap of comparable territory shall be and hereby is denied.

5. This Order shall be effective on and after the date of its approval.

Record at 324.

### Discussion and Decision

#### Waiver Argument

■ Because it could be dispositive, we address AEP's waiver argument first. AEP asserts that United waived its argument that the Commission lacked jurisdiction over the case by filing the original petition seeking a change in the boundaries and by not raising its jurisdictional argument at the first available opportunity. It is true that United filed Cause No. 41017 requesting that the Commission modify the service area boundary so as to place the ATC within United's assigned service area. At first blush, this action would seem to estop United from later arguing that the Commission lacked jurisdiction to modify the service area boundaries involving the ATC. However, we conclude otherwise and explain our rationale below.

■ "Judicial estoppel prevents a party from asserting a position in a legal proceeding inconsistent with one previously asserted." *Shewmaker v. Etter*, 644 N.E.2d 922, 931 (Ind.Ct.App.1994),

*adopted on trans. by Hammes v. Brumley,* 659 N.E.2d 1021 (Ind.1995).

> [I]t is the general rule that *allegations or admissions in pleadings in a former action or proceeding will ordinarily estop the party making them from denying their truth in a subsequent action or proceeding in which he is a party* to the prejudice of his opponent where the usual elements of estoppel by conduct are present. Also, *there must have been a determination of the prior action, or, at least, the allegations or admissions must have been acted on by the court in which the pleadings were filed or by the parties claiming the estoppel.*

*Wabash Grain, Inc. v. Smith,* 700 N.E.2d 234, 237 (Ind.Ct.App.1998) (citation omitted) (first emphasis in original; second emphasis added), *trans. denied.* "Unlike equitable estoppel, which focuses on the relationship between the parties, judicial estoppel focuses on the relationship between a litigant and the judicial system." 31 C.J.S. *Estoppel and Waiver* § 139 (1996). "The purpose of judicial estoppel is to protect the integrity of the judicial process rather than to protect litigants from allegedly improper conduct by their adversaries." *Wabash,* 700 N.E.2d at 238.

After AEP filed Cause No. 41021, United filed a motion to dismiss Cause No. 41017. The Commission granted United's motion to dismiss Cause No. 41017 prior to making any other rulings in that case. Consequently, there was no determination regarding Cause No. 41017. Since neither the Commission nor AEP acted upon the allegations, there was no danger of compromising the integrity of the judicial process. The reason for judicial estoppel was not present. Thus, United's filing of Cause No. 41017, seeking a change in the boundaries, did not waive United's argument that the Commission lacked jurisdiction over the case.

■ We are equally unpersuaded by the related contention that United waived its argument that the Commission lacked jurisdiction over the case by not bringing it up earlier. United raised the issue in a motion to dismiss shortly after the April hearing. Since a challenge to jurisdiction over a particular case involves a factual issue, and all the necessary facts in a case like this may not be unearthed until the hearing, we are unwilling to say United should have raised its jurisdiction challenge earlier. Further, the Commission clearly addressed the issue in its order. Record at 300–02; *cf. City of Marion v. Antrobus,* 448 N.E.2d 325 (Ind.Ct.App. 1983) and *State ex rel. Hight v. Marion Superior Court,* 547 N.E.2d 267 (Ind.1989) (jurisdiction issue not raised until long after judgment had been rendered). Accordingly, the issue was not waived.

### Background and Jurisdiction

■ Before we address the remaining issues, we provide some background. In 1980, the legislature enacted Indiana Code Section 8–1–2.3 creating a procedure in which the Commission was directed to draw the boundaries for electrical service areas. This legislation emerged from a long history of disputes between the rural cooperatives and privately or municipally owned utilities. Prior to 1980, the rural cooperatives were subject to eminent domain by private and municipal utilities under certain circumstances which created bitter disputes and were a source of much litigation. The purpose of the 1980 act was to draw permanent boundaries in an effort to eliminate these disputes and litigation. *See United Rural Elec. v. Indiana & Michigan Elec. Co.,* 549 N.E.2d 1019, 1021 (Ind.1990). Although ideally the boundaries were to be permanent, the code provides a mechanism for changing the boundaries in three specific situations. *See* IND.CODE § 8–1–2.3–6(3).

■ As for our jurisdiction over this matter,

> Ind.Code § 8–1–3–1 provides that any corporation or utility adversely affected by a Commission's ruling may appeal to our court within thirty days from the

order. In reviewing the Commission's order, we employ a two-tier standard of review. First, we determine whether the decision is supported by specific findings of fact and by sufficient evidence. Second, we consider whether the decision is contrary to law. A decision is contrary to law when the Commission fails to stay within its jurisdiction and to abide by the statutory and legal principles which guide it.

*Knox County Rural Elec. Membership Corp. v. PSI Energy, Inc.*, 663 N.E.2d 182, 189 (Ind.Ct.App.1996) (citations omitted), *trans. denied.*

### United's Two–Part Challenge

■ The Commission found that both United and AEP are "public utilities" and "electricity suppliers" as those terms are defined in the code. Record at 300. In finding that it had jurisdiction, the Commission explained:

Section 6(3) describes three scenarios where we have jurisdiction to modify previously assigned service areas. These are commonly known as the split site, single building, and integrated operation scenarios. In order for us to modify service boundaries due to a split site, a landowner must own a site which is intersected by the existing boundary and service must be best provided to that site by only one supplier. The single structure scenario exists when a single building is intersected by the boundary and the affected utilities are unable to agree on which utility shall serve the structure. The integrated operation scenario exists when the utilities cannot agree on which utility shall serve a single governmental, industrial or institutional operation which is located in the service area of two or more electricity providers. Pursuant to Section 6(3), if the split site scenario exists, the Commission must find that the public interest is served by one supplier providing service to the entire tract.

"In order for the Commission to acquire jurisdiction and modify service area boundaries pursuant to section 6(3) it is only necessary that the elements of one of the above ... scenarios be present." *Knox County R.E.M.C.*, Cause No. 39587 (IURC 6/1/94), p. 6 ("*Knox/PSI/Black Beauty* ").

It is undisputed that the [Authority] is a governmental entity which owns the [ATC], which is intersected by an existing boundary between AEP and United. It is also undisputed that the first tenant of the [ATC] will lease buildings to be owned by the [Authority] which are intersected by the existing boundary. AEP Exhibit DLL–4 *(Revised)*. Finally, the evidence establishes that the [Authority] is a municipal corporation which is developing the [ATC] as a single governmental operation which is being marketed and developed by the [Authority] on a unitized basis. AEP and United have been unable to agree on which of them should serve the [ATC]. Although inconsistently, United in its Answer and in its testimony requested authority to provide service to the entire [ATC]. Thus, the facts present in this case are ripe for consideration under either the first prong test that the landowner owns a single tract of land which is intersected by the boundary line of two utility providers and the second prong of the test wherein a single governmental operation is split and the suppliers are unable to agree which shall furnish electric service. For these reasons, we have jurisdiction over the parties and the subject matter of this proceeding.

At the hearing, United offered the opinion of a lay witness, Robert C. Dew, Jr., that the [ATC] was not a split site "as envisioned by the legislation" because energy will be consumed on the site by tenants. We find that Mr. Dew's opinion is unpersuasive. In fact, Mr. Dew's opinion is contradicted by admissions of United. For example, on May 14, 1997, United's Executive Vice President and Chief Executive Officer, wrote

to the first tenant of the [ATC] that it had chosen to locate in "what is known as a 'split site' based upon Public Law 69 in Indiana." AEP Exhibit CX–3. In any event, nothing in Section 6(3) excludes from its scope premises leased to tenants. In fact, Section 6(3) expressly defines the split site scenario in terms of a "landowner." In this case, the [Authority] is the landowner as well as the developer and operator of the [ATC]. Furthermore, the [Authority] will be a consumer of energy on the site for purposes of street lighting and when any building which it intends to lease to tenants is unoccupied. Accordingly, Section 6(3) is applicable to this proceeding. We must therefore determine what public convenience and necessity dictate with respect to electric service to the site.

Record at 301–02.

United makes a two-fold challenge to the Commission's authority under Indiana Code Section 8–1–2.3–6(3) to grant AEP's petition to modify its service boundary with United. United asserts that: 1) the territorial modification sought was for only a portion of the landowner's "single tract of land"; and, 2) no customer or customers constituted an integrated operation in the territory taken from United. United contends that, as a result, the Commission's decision was contrary to law. AEP, on the other hand, frames United's argument as a challenge to the sufficiency of the evidence.

If United were challenging the determination that, based upon public convenience and necessity, AEP should serve as the electricity provider for the ATC, then we would agree that United is merely challenging the sufficiency of the evidence. However, United is challenging AEP's right to even submit the matter to the Commission for such a determination. This is a jurisdiction question answered by examination of whether any of the situations presented by Indiana Code Section 8–1–2.3–6(3) existed here. Because United is challenging the Commission's jurisdiction, a question of law is presented. However, factual issues are interwoven in this challenge to the Commission's authority. Thus, in addressing the legal question of jurisdiction, we examine the facts most favorable to the Commission's decision.

The Commission has the authority to change the boundaries of the assigned service areas of electricity suppliers under the following limited circumstances:

> In the case where a landowner owns a *single tract of land* which is intersected by the boundary lines of two (2) or more assigned service areas, and retail electric service can best be supplied by only one (1) electricity supplier, or in the case where a customer or customers which are housed in a *single structure* or which constitute a *single governmental, industrial, or institutional operation,* and the electricity suppliers involved are unable to agree which shall furnish the electric service, any of the electricity suppliers may submit the matter to the commission for its determination based upon public convenience and necessity. If, after notice and hearing, the commission determines that one (1) or more electricity suppliers are to supply the required retail electric service and the boundaries of an assigned service area are to be changed, the assigned service area maps of the electricity suppliers shall be changed to reflect the new boundaries.

IND.CODE § 8–1–2.3–6(3) (emphases added).

■■■■ In addressing the meaning of "single tract of land" as used in the above statute, we recall several rules of statutory construction. *See* IND.CODE § 1–1–4–1(1). We do not and may not interpret a statute that is facially clear · and unambiguous. Rather, we give the statute its plain and clear meaning. *Skrzypczak v. State Farm Mut. Auto. Ins.,* 668 N.E.2d 291, 295 (Ind. Ct.App.1996). When construing a statute, the legislature's definition of a word binds us. If the legislature has not defined a word, we give the word its common and

ordinary meaning. *Id.* In order to determine the plain and ordinary meaning of words, courts may properly consult English language dictionaries. *Ashlin Transp. Servs., Inc. v. Indiana Unemployment Ins. Bd.,* 637 N.E.2d 162, 167 (Ind. Ct.App.1994).

If a statute is ambiguous, we seek to ascertain and give effect to the legislature's intent. *Skrzypczak,* 668 N.E.2d at 295. In doing so, we read an act's sections as a whole and strive to give effect to all of the provisions, *id.,* so that no part is held meaningless if it can be reconciled with the rest of the statute. *JKB, Sr. v. Armour Pharmaceutical Co.,* 660 N.E.2d 602, 605 (Ind.Ct.App.1996), *trans. denied.* Further, we presume that our legislature intended its language to be applied in a logical manner consistent with the statute's underlying policy and goals. *Walling v. Appel Service Co.,* 641 N.E.2d 647, 651 (Ind.Ct.App.1994).

The legislature did not define "single tract of land" for purposes of Indiana Code 8–1–2.3. Therefore, we look to dictionaries, other provisions of the statute, and the statute's underlying policies and goals to determine its meaning.[1]

"Single" has been defined as "[o]ne only; being a unit; alone; one which is abstracted from others." BLACK'S LAW DICTIONARY 1557 (4th ed.1951). The same source defines "tract" as "[a] lot, piece or parcel of land, of greater or less size, the term not importing, in itself, any precise dimension." *Id.* at 1665. "Land" in its most general sense, "comprehends any ground, soil, or earth whatsoever; as fields, meadows, pastures, woods, moors, waters, marshes, furzes, and heath." *Id.* at 1019.

The Commission was established to insure that public utilities provide constant, reliable, and efficient service to its customers, the citizens of this state. *Knox County,* 663 N.E.2d at 191. The express policy of the statutory scheme is to prevent the waste of material and resources and to promote economical, efficient, and adequate electric service. IND.CODE § 8–1–2.3–1. In particular, and as previously noted, the purpose of the 1980 act was to draw permanent boundaries in an effort to eliminate utility territory disputes and litigation. *United Rural Elec.,* 549 N.E.2d at 1021.

The Commission is imbued with broad discretion necessary for it to perform its function and arrive at its goals. *Knox County,* 663 N.E.2d at 191; *see also Northern Ind. Pub. Serv. Co. v. Citizens Action Coalition,* 548 N.E.2d 153, 158 (Ind.1989) ("An administrative agency has such implicit power and authority as is inherent in its broad grant of power from the legislature to regulate [that] which is necessary to effectuate the regulatory scheme outlined by the statute."). Moreover, as an administrative agency, the Commission is presumed to be qualified by knowledge and experience. *Knox County,* 663 N.E.2d at 191. The regulation of public utilities is a technical field requiring expertise. *Id.*

The facts favorable to the conclusion that the Commission has jurisdiction are as follows. The Authority, an independent municipal corporation yet an arm of county government for budgetary purposes, is charged with the ownership of the Airport. Between 1987 and 1991, the Authority acquired 433 acres of land. By 1994, a feasibility study was completed, indicating the desirability of the development of the ATC industrial park on the acquired land. The goals of the ATC are to attract economic development and investment activity to help support the economy of Northeast Indiana which, in turn, would provide additional employment. Due to its close proximity to the Airport, the ATC targets as potential tenants commercial aeronautical activities, transportation related businesses, warehouse distribution facilities requiring air freight access, and light manufacturing businesses.

---

1. Due to the differences in definitions, policies, and goals, we choose not to analogize the meaning of "single tract of land" used in condemnation or tax proceedings to the present situation.

To date, several million dollars have been committed to the ATC project; the land has been divided into twenty-seven preliminary lots; and AIF has committed as the first major tenant. However, the original electrical service boundary currently bisects the ATC and AIF. As one of United's witnesses state, "the area [is] a split site[.]" Record at 618. In the past, having two separate electricity service providers has created uncertainty and its attendant problems. For instance, when power outages have occurred, the confusion over which provider controls an area has led to delays in service being restored. Assigning the area to one provider would eliminate such confusion and prevent split site problems for future tenants. In addition, due to its nature, the ATC would benefit from a utility provider with the resources and experience to serve as a partner in the development of the industrial park project.

Keeping in mind the goals of the statute and the Commission's broad discretion to achieve those goals, we are unwilling to hold that the Commission erred in determining that it has jurisdictional authority under the "single tract of land" prong in view of these particular circumstances. The record contains facts to support the conclusion that the ATC constitutes a single tract of land which is intersected by the boundary lines of two assigned service areas, and retail electric service can best be supplied by only one electricity supplier. Because we have concluded that the Commission properly had jurisdiction over this case under the "single tract of land" theory, we need not examine whether the Commission properly had jurisdiction under the integrated operation theory.

Affirmed.

BAILEY, J. and HOFFMAN, Sr.J. concur.