**MICRONET, INC., Appellant–Defendant,**

v.

**INDIANA UTILITY REGULATORY COMMISSION, Appellee–Plaintiff.**

No. 93A02–0603–EX–237.

Court of Appeals of Indiana.

May 10, 2007.

Richard E. Aikman, Jr., Trenton F. Hahn, Stewart & Irwin, Indianapolis, IN, Attorneys for Appellant.

Susan L. Macey, Randall C. Helmen, J. David Agnew, Indiana Office of Utility Consumer Counselor, Steve Carter, Attorney General, David Lee Steiner, Deputy Attorney General, Beth Krogel Roads, Indiana Utility Regulatory Commission, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SHARPNACK, Judge.

Micronet, Inc. ("Micronet") appeals the order of the Indiana Utility Regulatory Commission ("Commission"). Micronet raises two issues, which we revise and restate as:

I. Whether the Commission had subject matter jurisdiction over Micronet's directory assistance service; and

II. Whether the Commission erred by imposing penalties against Micronet for billing for telecommunications services without customers' authorization.

We affirm.

The relevant facts follow. On March 16, 2004, the Commission granted Micronet a

certificate of territorial authority to provide wide area telephone service and/or interexchange, intrastate telecommunications services within the State of Indiana.[1] Micronet alleges that it offered a directory assistance service. On May 25, 2004, Micronet and HT Teleservices ("HTT") entered into a services agreement in which HTT was to provide billing and information management services for Micronet.

On February 4, 2005, the Indiana Office of Utility Consumer Counselor ("IOUCC") filed two complaints with the Commission against Micronet. The complaints alleged that Micronet billed customers[2] for directory assistance services that they did not authorize. On June 21, 2005, the IOUCC filed a third complaint, which alleged that Micronet billed other customers[3] for services that they did not authorize. The three complaints were later consolidated.

In discovery, Micronet stated that it only provided directory assistance and did not provide any other services. The IOUCC asked Micronet a series of discovery questions about the details of the services Micronet provided and scheduled depositions. Micronet did not attend the depositions and ceased cooperating with discovery.

On July 14, 2005, Micronet filed a motion to dismiss and argued, in part, that the Commission lacked subject matter jurisdiction over Micronet's directory assistance service. On September 14, 2005, the presiding officers denied Micronet's motion to dismiss. On October 19, 2005, the Commission unanimously upheld the presiding officers' decision denying Micronet's motion to dismiss.

On December 14, 2005, the Commission held an evidentiary hearing, which Micronet did not attend. On February 22, 2006, the Commission issued an order, which stated, in pertinent part:

\* \* \* \* \*

### 2. *Notice and Jurisdiction.*

Due, legal and timely notice of the public evidentiary hearing conducted herein was caused to be published by the Commission. Micronet is a "public utility" within the meaning of I.C. 8–1–2–1. Micronet's CTA No. 0403–3 was granted by the Commission on March 16, 2004 for authority to provide resold "[WATS] service and/or interexchange, intrastate telecommunications services within the State of Indiana." As determined in the Presiding Officers' September 14, 2005 docket entry, upheld upon appeal to the full Commission, the Commission has jurisdiction over HTT as a billing agent for Micronet. We therefore have jurisdiction over the parties and subject matter in this cause.

### 3. *Applicable Statutory Provisions.*

---

1. The Indiana Office of Utility Consumer Counselor ("IOUCC") only cites the Commission's order to support its statement of fact that "[t]he [Commission] granted Micronet a 'Certificate of Territorial Authority' to sell wide area telephone services ('WATS') 'and/or interexchange intrastate telecommunications services in Indiana' on March 16, 2004." IOUCC Appellee's Brief at 4. However, Micronet admits that "the [Commission] granted Micronet's CTA 'to provide resold "[WATS]" service and/or inter-exchange, intrastate telecommunications services within the state of Indiana.' " Appellant's Reply Brief at 9–10.

2. The customers included the Indiana Bureau of Motor Vehicles, Indiana Department of Natural Resources, Indiana Department of Revenue, the State of Indiana Campus Centrex, Indiana State Police, Indiana Department of Transportation, Indiana Department of Labor, Indiana Department of Workforce Development, Indiana National Guard, and David B. Mann, P.C.

3. This complaint listed more than one hundred businesses and individuals.

The complaints in these consolidated causes assert that Micronet and HTT committed acts of cramming. Cramming is defined as "[a] practice in which customers are billed for unexpected and unauthorized telephone charges or telephone services, which the [customer] didn't order, authorize or use." *Newton's Telecom Dictionary*, 19th ed. (2003.) Pursuant to 170 IAC 7–1.1–19(p) and I.C. 8–1–29–5, no billing agent acting for a primary interexchange carrier ("PIC") shall bill a customer for any service unless the PIC or local exchange carrier ("LEC") or billing agent possesses authorization from a customer. If the Commission determines that a cramming violation has occurred, it can refer the violation to the attorney general as a deceptive act. I.C. 8–1–29–8. If the Commission finds that a telecommunications provider has violated rules adopted for the protection of customers, or has switched or billed a customer without proper authorization, the Commission may impose a penalty of not more than two thousand five hundred dollars ($2,500) per offense. I.C. 8–1–29–7.5.

Pursuant to I.C. 8–1–2–48(a), we may "inquire into the management of the business of all public utilities, and [the Commission] shall keep itself informed as to the manner and method in which the same is conducted and shall have the right to obtain from any public utility all necessary information to enable the commission to perform its duties." Therefore, "every public utility is required to keep and render its books, accounts, papers and records accurately and faithfully in the manner and form prescribed by the commission and to comply with all directions of the commission relating to such books, accounts, papers, and records." I.C. 8–1–2–12. Under I.C. 8–1–2–50, the commission has the power to compel the production of "any books, accounts, papers, or records kept by" utilities. There is no exemption from testifying or producing documentary evidence on the grounds that such testimony or production might subject the party to penalty, forfeiture, or incrimination. I.C. 8–1–2–74.

We may compel production of discovery if a party to whom discovery is directed does not satisfy the discovery within ten (10) days of receipt. 170 IAC 1–1.1–16(b). If the Commission grants the motion to compel, "the party against whom discovery is sought shall allow discovery as specified in the commission's order." *Id.* A public utility, its officers, agents, or employees who fail to answer questions or who fail to produce records upon proper demand by the Commission commits a Class B infraction (I.C. 8–1–2–108), and every day that the failure or lack of compliance occurs is a separate and distinct violation. I.C. 8–1–2–112.

## 4. *The Commission's Authority to Enter a Default Judgment.*

### a. *Procedural and due process requirements for entry of default judgment.*

The OUCC requests default judgments against both Micronet and HTT for discovery violations, pursuant to T.R. 37. Upon review of the record, we have two grounds upon which a default judgment might be entered: a failure to appear at the scheduled hearing, leaving Respondents open to a default judgment, and/or as a sanction for discovery violations. We also refer to T.R. 55, which requires that a hearing must be held before a default judgment is entered; due process requires that a Respondent be given notice and an opportunity to be heard before such a judgment is entered. *Hatfield v. Ed-*

ward J. [DeBartolo] Corp., 676 N.E.2d 395 (Ind.App.1997).

Respondents were aware of the December 14, 2005 hearing and that sanctions had been requested. The OUCC filed its request for sanctions, including the penalties for cramming, discovery violations, and revocation of Micronet's CTA, on August 30, 2005, and the Presiding Officers took the sanctions under advisement upon the granting of the OUCC's *Motion to Compel* on September 30, 2005. In that same docket entry, the Presiding Officers set the evidentiary hearing for December 14, 2005. Respondents were thus given notice of the requested relief and an opportunity to be heard, and chose not to avail themselves of that opportunity. *J.C. Marlow Milking Mach. Co. v. Reichert,* 464 N.E.2d 364, 366 (Ind.App.1984), [*reh'g denied, trans. denied*]. The December 14, 2005 hearing satisfies the requirement under T.R. 55 that a hearing be held before entry of a default judgment. Therefore, the due process requirements for a default judgment have been met.

We find that we may, in our discretion, enter a default judgment against Respondents based on their failure to appear at the December 14, 2005 hearing. Nonetheless, as a result of the procedural history of this matter, we will go on to review the arguments in favor of discovery sanctions and the evidence of record.

b. *Entry of default judgment for discovery violations.*

We may respond to discovery violations with such sanctions "as are just which may include ... rendering judgment by default against a disobedient party." *Gribben v. Wal–Mart Stores, Inc.,* 824 N.E.2d 349, 351 (Ind.2005). We examine "whether the breach was

intentional or in bad faith ... to prevent elevating form over substance[,] it is necessary that the [Commission] determine more than the existence of a violation." [4] *Smith v. Archer,* 812 N.E.2d 218, 221 (Ind.App.2004).

The Commission:

> need not find that [Respondents'] conduct has or threatens to so delay and obstruct the rights of the opposing party that any other relief would be inadequate before granting default or dismissal. Rather, such conduct ... serves to tip the scales of discretion even more heavily in favor of default or dismissal than does disobedience without such conduct.

*Nesses v. Specialty Connectors Co., Inc.,* 564 N.E.2d 322, 327 n. 2 (Ind.App.1990).

When a party who has not complied with a discovery order is given an additional reasonable period of time within which to respond, has been warned in advance that a default judgment is the possible penalty for noncompliance, has not timely responded and has not requested additional time, and has not demonstrated a reason for the non-compliance, there is no abuse of discretion in the granting of dismissal or default. *Pfaffenberger v. Jackson Co. Regional Sewer Dist.,* 785 N.E.2d 1180, 1185 (Ind. App.2003). These elements closely match the procedural history and facts at bar.

The original prehearing conference order on March 23, 2005 allowed for informal discovery. Over the course of the ensuing months, numerous extensions of the procedural schedule were requested and granted. On July 7, 2005, the Presiding Officers denied a request by Respondents to hold discovery in abeyance, and stated that discov-

---

**4.** Bracketed text appears in Commission's order.

ery should continue as previously ordered between the parties. On August 10, 2005, the second prehearing conference order stated that the parties expected to resolve discovery within sixty (60) days. The OUCC filed its *Motion to Compel* and *Request for Sanctions* on August 30, 2005, and requested that the Commission enter a default judgment against Respondents. The requested sanctions included fines for cramming, for failing to comply with discovery, and the revocation of Micronet's CTA. Respondents filed their response on September 9, 2005, arguing against the requested remedies.

\* \* \* \* \*

There is no requirement in Indiana that we resort to a lesser sanction before imposing a default judgment. *Drew v. Quantum Sys., Inc.*, 661 N.E.2d 594, 595 (Ind.App.1996). We therefore find it appropriate to enter default judgments against both Micronet and HTT.

5. ***Evidence of Record Supporting Judgments against Respondents.***

 a. *OUCC's request for fines pursuant to I.C. 8–1–29–7.5*

Apart from the entry of judgment on procedural grounds, we also find sufficient evidence of record to support a judgment against Respondents.

In the answers to the OUCC's original data requests, Micronet and HTT both stated that they were responsible for the placement of charges on customers' bills. *See, Designation of Evidence*, Exhibit A. Both Respondents stated that while they originally believed the charges to be authorized, they now believed that the charges had been initiated by person or persons unknown. *Id.* However, Respondents have produced no evidence to support that assertion.

We also have evidence that during the pendency of this proceeding, the Commission's Consumer Affairs Division received seventeen (17) additional complaints of cramming against Micronet and HTT. See, *Tender of Communications*, August 23, 2005. There is no evidence that Respondents responded to these complaints or offered any defense to them. This further supports a finding that Micronet and HTT are responsible for the charges.

The OUCC has requested, and we so find, that both Micronet and HTT are responsible for the 364 allegations of cramming. We find that they should each pay $2,500 per violation, for a total of $910,000 by each Respondent.

\* \* \* \* \*

6. ***Conclusion.***

We find that Respondents engaged in the acts alleged in the complaint in the placement of unauthorized charges on consumers' bills. We find that Respondents have produced no evidence refuting the allegations and have, by virtue of their responses, implicated themselves in having placed the charges on those bills. Respondents have provided no documentation that would absolve them of the charges at issue. We therefore accept the OUCC's recommendation that we enter an order that Respondents each must pay a sum of $910,000, which represents 364 incidents of cramming, at $2,500 per incident.

Appellant's Appendix at 21–27 (footnotes omitted). The Commission also ordered fines of $161,000 for failure to comply with discovery orders, which Micronet does not appeal.

 ■ Initially, we note our jurisdiction over this matter. Ind.Code § 8–1–3–1 (2004) provides that any corporation or utility adversely affected by a Commis-

sion's ruling may appeal to our court within thirty days from the order. In reviewing the Commission's order, we employ a two-tier standard of review. First, we determine whether the decision is supported by specific findings of fact and by sufficient evidence. *Columbia City v. Indiana Util. Regulatory Comm'n,* 618 N.E.2d 21, 23 (Ind.Ct.App.1993), *reh'g denied.* Second, we consider whether the decision is contrary to law. *Id.* A decision is contrary to law when the Commission fails to stay within its jurisdiction and to abide by the statutory and legal principles that guide it. *Gary–Hobart Water Corp. v. Indiana Util. Regulatory Comm'n,* 591 N.E.2d 649, 652 (Ind.Ct.App.1992), *reh'g denied.*

## I.

■ The first issue is whether the Commission had subject matter jurisdiction over Micronet's directory assistance service.[5] The state law at issue is Ind.Code § 8–1–29–5 (2004), which governs the unauthorized billing for services, which is known as cramming,[6] and provides that "[a] customer of a telecommunications provider may not be ... billed for services by a telecommunications provider that without the customer's authorization added the services to the customer's service order." The Commission has jurisdiction over such complaints and may impose civil penalties for violations. I.C. 8–1–29–7, 7.5.

■ Micronet argues that the Commission did not have subject matter jurisdiction because federal law preempts state law in this situation. A federal statute

may preempt state law "by express language in a congressional enactment, by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or by implication because of a conflict with a congressional enactment." *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 541, 121 S.Ct. 2404, 2414, 150 L.Ed.2d 532 (2001) (internal citations omitted). States have a long history of regulating against unfair business practices. *California v. ARC America Corp.,* 490 U.S. 93, 101, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989). "When Congress legislates in a field traditionally occupied by the States, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.*

Micronet argues that federal law preempts state law by implication from the depth and breadth of a congressional scheme that occupies the legislative field. According to Micronet, federal law deregulated enhanced services, its directory assistance service is an enhanced service, and thus, the Commission is preempted from enforcing state consumer protection laws. We will first address whether the Federal Communications Commission's ("FCC") deregulation of common carrier regulation for enhanced services preempted enforcement of state consumer protection statutes.

■ We begin our analysis with a brief history of federal law. We begin with the

---

**5.** HTT does not appeal the Commission's order.

**6.** " 'Cramming' refers to charging a customer for services that were not ordered, authorized, or received." *Brittan Communications Int'l Corp. v. Southwestern Bell Tel. Co.,* 313 F.3d 899, 902 n. 2 (5th Cir.2002), *cert. denied,* 538 U.S. 1034, 123 S.Ct. 2091, 155 L.Ed.2d

1064 (2003). *See also In the Matter of Truth–In–Billing and Billing Format, Second Report and Order, Declaratory Ruling, and Second Further Notice of Proposed Rulemaking,* 20 F.C.C.R. 6448, 6476 n. 163 (Released March 18, 2005) ("Cramming is the submission or inclusion of unauthorized, misleading, or deceptive charges for products or services on subscribers' telephone bills.").

Communications Act of 1934. The purposes of the Communications Act of 1934 were "to extend the jurisdiction of the existing Radio Commission to embrace telegraph and telephone communications as well as those by radio," *Weiss v. U.S.*, 308 U.S. 321, 328, 60 S.Ct. 269, 272, 84 L.Ed. 298 (1939), and "to protect the public interest in communications." *Scripps–Howard Radio v. F.C.C.*, 316 U.S. 4, 14, 62 S.Ct. 875, 882, 86 L.Ed. 1229 (1942).

"[A]s technological tides had created opportunities for competition in the sale of customer-premises equipment and in the sale of long distance services, so too had advances in computer technology created new uses for the nation's telecommunications networks." Harvey Reiter, *The Contrasting Policies of the FCC and FERC Regarding the Importance of Open Transmission Networks in Downstream Competitive Markets*, 57 FED. COMM. L.J. 243, 263 (2005). "The FCC began to explore the competitive ramifications of these advances in a series of rulemakings that started in the early 1970s." *Id.*

In *Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry), Final Decision*, 77 F.C.C.2d 384, 1980 WL 356789 (1980) (hereinafter "*Computer II*"), on *reconsideration, Memorandum Opinion and Order on Further Reconsideration*, 88 F.C.C.2d 512, 1981 WL 158727 (1981), *aff'd sub nom. Computer and Commc'n Indus. Ass'n v. FCC*, 693 F.2d 198 (D.C.Cir.1982), *cert. denied*, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983), the FCC separated services into basic and enhanced and concluded that enhanced services should not be subject to regulation. 77 F.C.C.2d at ¶¶ 1, 92. The FCC explained the difference between "basic transmission services" and "enhanced services" as follows:

We find that basic service is limited to the common carrier offering of transmission capacity for the movement of information, whereas enhanced service combines basic service with computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information, or provide the subscriber additional, different, or restructured information, or involve subscriber interaction with stored information.

*Id.* at ¶ 2. The FCC explained that regulation of enhanced services was unwarranted because the competitive environment of enhanced services was providing substantial public benefit. *Id.* at ¶¶ 127–128.

"In 1996, Congress amended the Communications Act of 1934 with the passage of the Telecommunications Act of 1996 which is codified as amended in scattered sections of title 47, United States Code." *Indiana Bell Telephone Co., Inc. v. Indiana Utility Regulatory Comm'n*, 764 N.E.2d 734, 738 (Ind.Ct.App.2002), *reh'g denied, trans. denied.* The purpose of the Act "was to replace telecommunications monopolies and regulation with competitive markets." *Id.*

[The Telecommunications Act of 1996] promotes competition and reduces regulation in order to secure lower prices and higher quality services for American telecommunications consumers.... [The Act] opens all communications services to competition. The result will be lower prices to consumers and businesses, greater choice of services, more innovation, and less regulation. Indeed, the enormous benefits to American businesses and consumers from lifting the shackles of monopoly regulation will almost certainly earn the ... Act ... the distinction of being the most deregulatory bill in history.

*Id.* (quoting *Bell Atlantic–New Jersey, Inc. v. Tate*, 962 F.Supp. 608, 612 (D.N.J. 1997) (quoting H.R.Rep. No. 204, 104th

Cong., 2nd Sess., 47–48, reprinted in 1996 U.S.C.C.A.N. 10–11)).

The Telecommunications Act of 1996, 47 U.S.C. 151, does not utilize the FCC's basic/enhanced terminology. Rather, it uses the terms "telecommunications services" and "information services." [7] The FCC has concluded that the services that it had previously considered to be enhanced services are information services. See *In the Matter of Computer III Further Remand Proceedings: Bell Operating Company Provision of Enhanced Services*, 13 F.C.C.R. 6040, ¶ 40, 1998 WL 34849 (Released January 30, 1998) (noting that the FCC had concluded that "although the text of the Commission's definition of 'enhanced services' differs from the 1996 Act's definition of 'information services,' the two terms should be interpreted to extend to the same functions"), rule *modification granted by*, 14 F.C.C.R. 4289 (1999), *reconsideration granted in part by* 14 F.C.C.R. 21628 (1999).[8]

With this background, we proceed to determine whether the Commission had subject matter jurisdiction over Micronet's cramming via its directory assistance service. We will address whether the FCC's deregulation of common carrier regulation for enhanced services preempted the enforcement of Indiana's cramming statutes. We will examine: (A) provisions in the Telecommunications Act of 1996; (B) the applicability of the cases cited by Micronet to the issue of cramming; (C) the FCC's position on jurisdiction over cramming issues; and (D) federal decisions under the complete preemption doctrine.

### A. Provisions in the Telecommunications Act of 1996

The United States Supreme Court has held:

> The definitions of the terms "telecommunications service" and "information service" established by the 1996 Act are similar to the Computer II basic-and enhanced-service classifications. "Telecommunications service"—the analog to basic service—is "the offering of telecommunications for a fee directly to the public ... regardless of the facilities used." 47 U.S.C. § 153(46). "Telecommunications" is "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." § 153(43). "Telecommunications carrier[s]"—those subjected to mandatory Title II common-carrier regulation—are defined as "provider[s] of telecommunications services." § 153(44). And "information service"—the analog to enhanced service—is "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications ..." § 153(20).

---

**7.** The Telecommunications Act of 1996 defines "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing, *without change in the form or content of the information as sent and received.*" 47 U.S.C. § 153. "Telecommunications services" is defined as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153. The Telecommunications Act of 1996 defines "information services" as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes *electronic publishing*, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." *Id.*

**8.** *See also National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 125 S.Ct. 2688, 2697, 162 L.Ed.2d 820 (2005), which held:

As we have often observed, pre-emption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. The question, at bottom, is one of statutory intent, and we accordingly begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S.Ct. 2031, 2036, 119 L.Ed.2d 157 (1992) (internal quotation marks and citations omitted).

We find certain provisions of the Telecommunications Act of 1996 instructive. 47 U.S.C. § 253 governs the removal of barriers to entry and "preserve[s] in the states the right to protect the interests of consumers," *Doty v. Frontier Communications Inc.*, 272 Kan. 880, 36 P.3d 250, 258–259 (2001), and provides:

(a) In general

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

(d) Preemption

If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

The Federal Communications Act contains a savings clause, 47 U.S.C. § 414, which addresses the exclusiveness of the chapter and provides:

Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.

Sections 253 and 414 support a finding that federal law does not preempt Indiana's cramming statutes.

### B. *Cases Cited by Micronet Do Not Address Cramming*

The cases cited by Micronet did not involve a discussion of cramming laws, but rather distinguished enhanced services from basic services for the purpose of encouraging enterprise in a free market so that consumers would ultimately benefit. *See Computer II,* 77 F.C.C.2d at ¶ 7 (stating that "the absence of traditional public utility regulation of enhanced services offers the greatest potential for efficient utilization and full exploitation of the interstate telecommunications network" and

that "[s]ignificant public benefits accrue to the Commission's regulatory process, providers of basic and enhanced services, and consumers under this approach"). When *Computer II* deregulated enhanced services, it eliminated common carrier regulation for these services. Common carrier regulations had not, by statute, preempted applicability and enforcement of state consumer protection laws. Deregulation of enhanced services could not affect the applicability of state consumer protection laws. We do not view the present case as an attempt to limit entry into the market. Rather, this case focuses on Indiana's cramming laws. See *Doty*, 36 P.3d at 259 (holding that federal preemption did not exist and that the state law at issue "if seen as a barrier to a telecommunication carrier's ability to enter or stay in the market, would appear to fall under the safe harbor of protecting the rights of Kansas consumers"). Thus, we do not find the cases cited by Micronet to be determinative.

### C. FCC Statements Regarding Jurisdiction over Cramming Issues

■ The FCC has commented on jurisdiction on cramming issues. In *In the Matter of Vonage Holdings Corporation*, 19 F.C.C.R. 22404 ¶ 1 (Released Nov. 12, 2004), *aff'd* by *Minnesota Public Utilities Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007), the FCC stated that "this Commission, not the state commissions, has the responsibility and obligation to decide whether certain regulations apply to ...

IP-enabled services having the same capabilities," but noted that "states will continue to play their vital role in protecting consumers from fraud, enforcing fair business practices, for example, in advertising and billing, and generally responding to consumer inquiries and complaints." *Id.* In a statement attached to the FCC order, FCC Chairman Michael K. Powell "observed that the states play an important role in combating the practices of slamming [9] and cramming." *OCMC, Inc. v. Norris*, 428 F.Supp.2d 930, 939 (S.D.Iowa 2006) (citing *Vonage*, 19 F.C.C.R. 22404). Specifically, Chairman Powell stated:

There will remain very important questions about emergency services, consumer protections from waste, fraud and abuse and recovering the fair costs of the network. It is not true that states are or should be complete bystanders with regard to these issues. Indeed, there is a long tradition of federal/state partnership in addressing such issues, even with regard to interstate services. For example, in long distance services, the FCC and state commissions have structured a true partnership to combat slamming and cramming.

*Vonage*, 19 F.C.C.R. at 22438.

As recently as 2005,[10] the FCC addressed and requested comment on the jurisdictional question involving cramming laws. In 2005, the FCC made the following tentative conclusions, which it sought comment on:

**9.** " 'Slamming' refers to switching a customer's long-distance provider without the customer's consent." *Brittan Communications Int'l Corp.*, 313 F.3d at 902 n. 2.

**10.** The FCC also sought comment in 1998. *See In the Matter of Truth–in–Billing and Billing Format, Notice of Proposed Rulemaking*, CC Docket No. 98–170 (Released September 17, 1998) (available at http://www.fcc.gov/ Bureaus/Common—Carrier/Notices/1998/fcc 98232.pdf) ("We seek comment particularly on how our jurisdiction should complement that of the states and other agencies. We recognize that many states and their public utility commissions have in place or are considering requirements designed to protect their consumers from abuses associated with questionable billing practices.").

In accord with our precedents, we tentatively conclude that the line between the Commission's jurisdiction and states' jurisdiction over carriers' billing practices is properly drawn to where states only may enforce their own generally applicable contractual and consumer protection laws, albeit as they apply to carriers' billing practices.

\* \* \* \* \*

We also solicit comment on the practical reach of the line that we tentatively delineate between the Commission's jurisdiction and states' jurisdiction over carriers' billing practices. For instance, Verizon Wireless cites New Mexico regulations that Verizon Wireless claims effectively bar carriers from including non-communications services on bills. It also cites a California regulation that permits carriers to include non-communications services on bills, but requires them to place charges for such services in one or more separate sections of the telephone bill clearly labeled "Noncommunications-related charges." Pursuant to the jurisdictional line that we delineate, do such protections against "cramming" properly fall within the Commission's jurisdiction, or within states' jurisdiction?

*In the Matter of Truth–In–Billing and Billing Format, Second Report and Order, Declaratory Ruling, and Second Further Notice of Proposed Rulemaking*, 20 F.C.C.R. 6448, 6476 (Released March 18, 2005), *vacated on other grounds by National Ass'n of State Utility Consumer Advocates v. F.C.C.*, 457 F.3d 1238 (11th Cir.2006), *opinion modified on other grounds*, 468 F.3d 1272 (11th Cir.2006).[11] We conclude that the FCC's comments indicate that consumer protection is still a state function and is not preempted by federal law.

### D. Complete Preemption

 Courts have held that the Federal Communications Act does not preempt state legislation regarding consumer protection.[12] *See Sapp v. AT & T*

---

**11.** The FCC's order clarified that state regulations requiring or prohibiting the use of line items for Commercial Mobile Radio Service constituted rate regulation and was preempted under section 332(c)(3)(A). *In the Matter of Truth–In–Billing and Billing Format, Second Report and Order, Declaratory Ruling, and Second Further Notice of Proposed Rulemaking*, 20 F.C.C.R. at 6449. The Eleventh Circuit concluded that "the Commission exceeded its authority when it preempted the states from requiring or prohibiting the use of line items. The scope of federal authority to regulate 'rates' or 'entry' does not include the presentation of line items on cellular wireless bills. 47 U.S.C. § 332(c)(3)(A). This billing practice is a matter of 'other terms and conditions' that Congress intended to be regulable by the states." *National Ass'n of State Utility Consumer Advocates v. F.C.C.*, 457 F.3d at 1242.

**12.** These cases utilized the complete preemption doctrine, which provides that "in some cases, 'Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character.'" *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987). However, to invoke the doctrine, "the pre-emptive force of a statute [must be] so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393, 107 S.Ct., 2425, 2430, 96 L.Ed.2d 318 (1987) (quoting *Metropolitan Life*, 481 U.S. at 65, 107 S.Ct. at 1547).

The Eleventh Circuit explained the difference between complete preemption and ordinary preemption as follows:

The inclusion of the term "preemption" within the doctrine's label, while not inaccurate, has enkindled a substantial amount of confusion between the complete preemption doctrine and the broader and more familiar doctrine of ordinary preemption. Stated simply, complete preemption func-

*Corp.*, 215 F.Supp.2d 1273, 1274, 1277, 1277 n. 4 (M.D.Ala.2002) (addressing plaintiffs' allegation of slamming and concluding that there was no complete preemption for purposes of removal to federal court); *Marcus v. AT&T Corp.*, 138 F.3d 46, 51, 54 (2d Cir.1998) (addressing plaintiffs' complaint that AT & T deceived its customers by failing to disclose that customers were billed per minute rounded up to the next higher full minute and holding that the Federal Communications Act "not only does not manifest a clear Congressional intent to preempt state law actions prohibiting deceptive business practices, false advertisement, or common law fraud, it evidences Congress's intent to allow such claims to proceed under state law" and noting that "[t]he [Federal Communications Act's] savings clause states that nothing in the FCA 'shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are *in addition to such remedies.*' 47 U.S.C. § 414 (emphasis added)"); and *DeCastro v. AWACS*, 935 F.Supp. 541, 551 (D.N.J.1996) (addressing plaintiffs' allegation of consumer fraud and other state claims and holding that "[a] strong indication that Congress did *not* intend that the Act pre-empt all claims within the telecommunications area is the Act's survival clause: Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies") (quoting 47 U.S.C. § 414), *appeal dismissed* by 940 F.Supp. 692 (D.N.J.1996).[13]

tions as a narrowly drawn means of assessing federal removal jurisdiction, while ordinary preemption operates to dismiss state claims on the merits and may be invoked in either federal or state court. As summarized by the Fifth Circuit,

"complete preemption" is less a principle of substantive preemption than it is a rule of federal jurisdiction. In other words, complete preemption principally determines not whether state or federal law governs a particular claim, but rather whether that claim will, irrespective of how it is characterized by the complainant, [serve as the basis for federal question jurisdiction].

*BLAB T.V. of Mobile, Inc. v. Comcast Cable Communications, Inc.*, 182 F.3d 851, 854–855 (11th Cir.1999) (quoting *McClelland v. Gronwaldt*, 155 F.3d 507, 516–517 (5th Cir.1998), *overruled on other grounds by Arana v. Ochsner Health Plan*, 338 F.3d 433, 440 (5th Cir. 2003)).

We recognize the difference between complete preemption and ordinary preemption, but still find these cases instructive.

**13.** We note that *Ivy Broadcasting Co. v. American Tel. & Tel. Co.*, 391 F.2d 486, 489, 491 (2d Cir.1968), held that the district court had jurisdiction over plaintiff's actions for damages resulting from negligence and breach of contract in the rendition of interstate telephone service and concluded that:

[Q]uestions concerning the duties, charges and liabilities of telegraph or telephone companies with respect to interstate communications service are to be governed solely by federal law and that the states are precluded from acting in this area. Where neither the Communications Act itself nor the tariffs filed pursuant to the Act deals with a particular question, the courts are to apply a uniform rule of federal common law.

Other cases have refused to follow *Ivy*. In *American Inmate Phone Systems, Inc. v. US Sprint Communications Co. Ltd. P'ship*, 787 F.Supp. 852, 856 (N.D.Ill.1992), the court held:

The court declines to follow *Ivy* for a number of reasons. First, the *Ivy* court did not address the "savings clause" of the Communications Act. The savings clause provides:

Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.

47 U.S.C. § 414. Since *Ivy*, other courts have addressed the remedies Congress had in mind when enacting § 414. *See Comtronics, Inc. v. Puerto Rico Tel. Co.*, 553 F.2d 701 (1st Cir.1977). The *Comtronics* court interpreted § 414 as preserving state court claims for breaches of duties which

■ Based on the aforementioned provisions in the Telecommunications Act of 1996, the fact that the cases cited by Micronet do not address cramming, the lack of a declaration by the FCC regarding preemption in the cramming context, and the holdings of federal courts that federal law does not completely preempt state law in this context, we conclude that federal law does not occupy the field. Accordingly, we conclude that federal law does not preempt Indiana's cramming laws.

■ Even assuming that federal law preempts state regulation of cramming by information services, we conclude that Micronet's directory assistance service does not constitute an information service. Micronet argues that because "the Commission is preempted from asserting jurisdiction over enhanced or information services, it did not have the authority to impose any violations on Micronet." Appellant's Brief at 6. Micronet refers to its service as a "directory assistance service" that "entails nothing more than providing an end user customer with the ability to contact, via calling a toll free telephone number and entering a customer assigned PIN, an automated computer database containing directory listing information for both residences and businesses." *Id.*

The FCC has stressed the purpose of a service in determining whether a service qualifies as a basic service or an information service. *See In the Matter of North American Telecommunications Association Petition for Declaratory Ruling Under Section 64.702 of the Commission's Rules Regarding the Integration of Centrex, Enhanced Services, and Customer Premises Equipment,* 101 F.C.C.2d 349, 1985 WL 260310, ¶ 25 (Released May 29, 1985) (noting that the "purpose served by" a service and its "relationship . . . to basic telephone service . . . distinguishes . . . adjunct services from technologically similar enhanced services"). Specifically, the FCC addressed the purpose of directory assistance as follows:

The significance of purpose in identifying a "basic" adjunct to basic service is perhaps most clear in the case of directory assistance. When a customer uses directory assistance, that customer accesses information stored in a telephone company data base. Ordinarily, assuming the data base was in a computer, such a service would be considered enhanced. "Dial-it," for example, was a service offered by AT & T which allowed information about news, stock prices, etc., to be stored within the network for

---

are distinguishable from duties created by the Communications Act, such as breach of contract claims. *Comtronics,* 553 F.2d at 708 n. 6. Other courts have approved state-law claims for fraud and deceit as well. *See In re Long Distance Telecommunications Litigation,* 831 F.2d 627, 633 (6th Cir.1987).

The Fifth Circuit also criticized *Ivy.* In *MCI Telecommunications Corp. v. Credit Builders of America Inc.,* 980 F.2d 1021, 1022 (5th Cir.1993), *reh'g denied, vacated on other grounds,* 508 U.S. 957, 113 S.Ct. 2925, 124 L.Ed.2d 676 (1993), the court addressed whether the district court's dismissal of the case should be reversed based on *Ivy* and held:

The Second Circuit in *Ivy* held that "questions concerning the duties, charges, and liabilities" of carriers are to be governed solely by federal law. *Ivy,* 391 F.2d at 491. The court in *Ivy* concluded the federal interest in telephone companies is so strong and the legislation regulating such companies is so comprehensive that federal common law gives a remedy for tort or breach of contract even though the statutes provide no such remedy, either expressly or impliedly. *Id.* at 491. We are not persuaded by the reasoning in *Ivy.* In fact, the decision in *Ivy* has received much criticism. The decision has been referred to as "extreme" and "questionable."
(quoting CHARLES A. WRIGHT, LAW OF FEDERAL COURTS § 60 (4th Ed.1983)).

retrieval by subscribers. In the Reconsideration, we found Dial-it to "constitute more than the common carrier offering of a channel of communication and [therefore to] clearly fall outside the scope of a basic service." The only significant difference between Dial-it and directory assistance is that the latter service provides only that information about another subscriber's telephone number which is necessary to allow use of the network to place a call to that other subscriber. An offering of access to a data base for the purpose of obtaining telephone numbers may be offered as an adjunct to basic telephone service; an offering of access to a data base for most other purposes is the offering of an enhanced service.

*Id.* at ¶ 26 (footnote omitted). Because Micronet's directory assistance service provides access to a database for the purpose of obtaining telephone numbers, that service constitutes an "adjunct to basic telephone service." *See id. In the Matter of Implementation of Section 255 of the Telecommunications Act of 1996*, 13 F.C.C.R. 20391, 1998 WL 992044, ¶ 39 (Released April 20, 1998) (stating that "adjunct-to-basic" services include "computer-provided directory assistance"), *republished with concurring opinion*, 1998 WL 185139 (1998), *order issued*, 16 F.C.C.R. 6417, 1999 WL 770958 (1999), *comment period extended*, 1999 WL 997064, *comment period extended* 15 F.C.C.R. 4948, 2000 WL 249180 (2000). The FCC has "found that services it had previously classified as 'adjunct-to-basic' should be classified as telecommunications services" because such a service is "basic in purpose and facilitate[s] the completion of calls through utilization of basic telephone service facilities." *In the Matter of Implementation of Section 255 of the Telecommunications Act of 1996*, 13 F.C.C.R. 20391 at ¶ 39. Based on the foregoing

holdings, we conclude that Micronet's directory assistance constitutes a telecommunications service. Thus, even assuming that federal law preempts state regulation of cramming by *information* services, we conclude that Micronet's directory assistance service does not constitute an information service and is subject to state regulation.

## II.

■ The next issue is whether the Commission erred by imposing penalties against Micronet for cramming. Micronet argues that it is not subject to the cramming provisions located in Ind.Code § 8–1–29 and Ind. Admin. Code tit. 170, r. 7–1.1–19. The Commission entered the penalties against Micronet on two bases: (A) default judgment; and (B) the evidence in the record supported judgment against Micronet. Because Micronet does not appeal the entry of the default judgment, we need not address Micronet's arguments regarding Ind.Code § 8–1–29 and 170 IAC 7–1.1–19. *See Picadilly, Inc. v. Colvin*, 519 N.E.2d 1217, 1221 (Ind.1988) ("A general verdict will be sustained if the evidence is sufficient to sustain any theory of liability."); *Jamrosz v. Resource Benefits, Inc.*, 839 N.E.2d 746, 761 (Ind.Ct.App.2005) ("We need not address the other sufficiency claims regarding the breach of contract, fraud, constructive fraud, and civil conspiracy judgments because the judgment is sustainable on the basis of the conversion."), *trans. denied.*

■ Notwithstanding Micronet's failure to appeal the default judgment, we will address the merits of Micronet's arguments. It is a fundamental principle of law that the Commission, an administrative body of the state, derives its authority solely from the legislature and thereby possesses only those powers conferred on it by statute. *Knox County Rural Elec.*

*Membership Corp. v. PSI Energy, Inc.,* 663 N.E.2d 182, 189 (Ind.Ct.App.1996), *trans. denied.* Thus, unless a grant of power can be found in the statute, we must conclude that there is none. *Id.* (relying on *Citizens Action Coalition of Indiana, Inc. v. NIPSCO,* 485 N.E.2d 610, 612 (Ind. 1985), *cert. denied,* 476 U.S. 1137, 106 S.Ct. 2239, 90 L.Ed.2d 687 (1986)). Accordingly, any doubt about the existence of authority must be resolved against a finding of authority. *Knox County Rural Elec. Membership Corp.,* 663 N.E.2d at 189. "However, we have also held that in addition to the generally accepted principle that an administrative agency may not exercise power which is not granted to it by statute, 'it is equally well settled that an administrative agency has such implicit power and authority as is inherent in its broad grant of power from the legislature to regulate [that] which is necessary to effectuate the regulatory scheme outlined by the statute.'" *Id.* (quoting *NIPSCO v. Citizens Action Coalition of Indiana, Inc.,* 548 N.E.2d 153, 158 (Ind.1989)).

As previously mentioned, Ind.Code § 8–1–29–5 governs the unauthorized billing for services and provides that "[a] customer of a telecommunications provider may not be ... billed for services by a telecommunications provider that without the customer's authorization added the services to the customer's service order." [14] Ind.Code § 8–1–29–7.5 governs civil penalties for violations of Ind.Code § 8–1–29–5 and provides:

(a) If after notice and hearing the commission finds that a telecommunications provider has violated:

(1) section 5 of this chapter; or

(2) rules adopted under section 6 of this chapter;

the commission may impose a civil penalty of not more than two thousand five hundred dollars ($2,500) for each offense.

Micronet, in its appellant's brief, does not dispute that it provided customers with a service for a fee and that without the customer's authorization it added services to the customer's service order.[15] Thus, we must determine whether Micronet's service falls under the statutory definition of "telecommunications." "'[T]elecommunications' means the electronic transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information sent and received." Ind.Code § 8–1–29–2 (2004). Micronet argues that it is not a telecommunications provider under Ind. Code § 8–1–29–3 because it "does not provide 'telecommunications' to its customers, but rather, provides an 'enhanced' or 'information' service through directory assistance which falls outside the statutory definition for 'telecommunications.'" Appellant's Brief at 8. However, Micronet also argues that it "provides customers with nothing more than access to a directory listing information stored on a com-

**14.** "'[T]elecommunications provider' means a person that provides telecommunications service." Ind.Code § 8–1–29–3 (2004). "'[T]elecommunications service' means making telecommunications available to the public for a fee." Ind.Code § 8–1–29–4 (2004).

**15.** In Micronet's reply brief, Micronet argues for the first time that it was not a "telecommunications provider" because "[t]he fee paid by a customer to Micronet is received by Micronet before any services are provided," "[t]herefore, the service, *i.e.,* the customer calling the toll-free number and accessing the directory assistance database, has no fee associated with it." Appellant's Reply Brief at 8–9. An argument raised for the first time in a reply brief is waived. *See, e.g., Felsher v. Univ. of Evansville,* 755 N.E.2d 589, 593 n. 6 (Ind.2001).

puter database." Appellant's Brief at 8. The information transmitted occurs without a change in the form or content of the information sent and received. Accordingly, we conclude that Micronet's service constitutes telecommunications as defined by Ind.Code § 8-1-29-2 (2004). Thus, Micronet violated Ind.Code § 8-1-29-5, and the Commission was authorized to impose penalties against Micronet pursuant to Ind.Code § 8-1-29-7.5.

■ We will also address the Indiana Administrative Code. Ind.Code § 8-1-29-6 provides:

> The commission shall adopt rules under IC 4-22-2 to implement IC 8-1-29-5.5. The commission's rules shall ensure that a customer of a telecommunications provider is not:
>
> (1) switched to another telecommunications provider without the customer's authorization; or
>
> (2) billed for additional services by a telecommunications provider that without the customer's authorization added the services to the customer's service order.
>
> The rules adopted under this section must be consistent with rules adopted by the Federal Communications Commission concerning verification procedures for the switching of a customer's telecommunications provider.

Ind. Admin. Code tit. 170, r. 7-1.1-19 governs the "[u]nauthorized switching of telecommunications providers; billing for telecommunications or other services added without customer's consent." Ind. Admin. Code tit. 170, r. 7-1.1-19(p) governs unauthorized switching of telecommunications providers and provides:

(p) Except for tariff-regulated, customer-initiated, one-time use products, such as collect calling services, optional pay-per-use services (including automatic callback, repeat dialing, and three-way calling), no PIC or LEC or any billing agent acting for said PIC or LEC shall bill a customer for any service unless the PIC, LEC, or billing agent possesses written or electronic documentation that shows:

(1) the name of the customer requesting the service;

(2) a description of the service requested by the customer;

(3) the date on which the customer requested the service;

(4) the means by which the customer requested the service; and

(5) the name, address, and telephone number of all sales agents involved.

Ind. Admin. Code tit. 170, r. 7-1.1-19(a)(6) defines a "PIC" as follows:

"Primary interexchange carrier" or "PI" means a provider of presubscribed inter-LATA or intra-LATA [16] long distance telecommunications services. The term includes the following:

(A) Presubscribed facilities-based carriers of long distance service.

(B) Resellers of long distance service.

(C) Local exchange carriers providing long distance service.

In those local exchanges where intra-LATA equal access is available, customers may receive presubscribed long distance service from more that one (1) PIC (one (1) for inter-LATA and one (1) for intra-LATA toll) or may select a single PIC that provides both inter-LATA and intra-LATA toll service.

---

16. Although the Indiana Administrative Code does not define "LATA," a "LATA is the geographic area within which ILECs can provide telephone service; calls within a LATA are referred to as intraLATA calls they include local calls and toll calls covering a distance beyond local calls." *Indiana Bell Telephone Co., Inc.,* 764 N.E.2d at 737 n. 3.

An "LEC" is defined as a "[l]ocal exchange carrier" and "means a provider of switched telecommunications service that carries calls originating and terminating within the local calling area." Ind. Admin. Code tit. 170, r. 7–1.1–19(a)(4).

Micronet argues that "providing directory assistance does not fit within the definitions of a 'PIC' or 'LEC' as Micronet does not provide long distance or switched telecommunications." Appellant's Brief at 8. The Commission argues that "[b]ased on the [certificate of territorial authority] granted by this Commission, Micronet was given the authority to provide WATS and/or interexchange, intrastate services" and "[a]s a reseller of long-distance services, they fall within the definition of a primary interexchange carrier or PIC." Commission's Brief at 13–14. Micronet admits that "the [Commission] granted Micronet's CTA 'to provide resold "[WATS]" service and/or inter-exchange, intrastate telecommunications services within the state of Indiana.' " [17] Appellant's Reply Brief at 9–10. However, Micronet argues that it "does not provide WATS and/or inter-exchange service, but rather, provides directory assistance service," and that "[s]imply because Micronet was granted authority to provide inter-exchange service in Indiana does not confer jurisdiction on the [Commission] over services that are outside the scope of the authority granted." Id. at 10. Micronet argues that "[s]uch an interpretation would essentially allow the [Commission] to assert jurisdiction over, for example, an entity's labor practices simply because it was granted authority to resell long distance services." Id. We disagree.

The Commission has jurisdiction over PICs and had granted Micronet authority to operate as a PIC. Micronet failed to comply with the IOUCC's requests for dis-covery to determine exactly what services Micronet provided. As previously discussed, the Commission has jurisdiction over Micronet as a telecommunications provider. Further, the Commission has jurisdiction over cramming, which is at issue in this case. Thus, we conclude that the Commission had authority to impose penalties on Micronet for cramming. *See, e.g., Knox County Rural Elec. Membership Corp.,* 663 N.E.2d at 190–191 (holding that the Commission did not act beyond its statutory authority).

For the foregoing reasons, we affirm the Commission's order.

Affirmed.

SULLIVAN and CRONE, JJ., concur.

---

17. Text in brackets appears in original text.